Barry I. Levy (BL 2190)
Michael A. Sirignano (MS 5263)
Ryan Goldberg (RG 7570)
RIVKIN RADLER LLP
926 RXR Plaza
Uniondale, New York 11556
(516) 357-3000

*Counsel for Plaintiffs, Government Employees Insurance
Co., GEICO Indemnity Co., GEICO General Insurance
Company and GEICO Casualty Co.*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X

| | |
|---|---|
| GOVERNMENT EMPLOYEES INSURANCE CO., GEICO INDEMNITY CO., GEICO GENERAL INSURANCE COMPANY and GEICO CASUALTY CO., | 15-cv-4693 <br> Docket No.:        (        ) |
| Plaintiffs, | |
| -against- | **Plaintiffs Demand a Trial by Jury** |
| AHMED ADEL EL SOURY, M.D., SAMAH MOHAMED MAHMOUD SHAHEN, P.T., | |
| -and- | |
| RECOVER MEDICAL SERVICES, P.C., OUTREACH REHAB PT, P.C., | |
| -and- | |
| MIKHAIL ZEMLYANSKY, MICHAEL DANILOVICH, MICHAEL BARUKHIN, MIKHAIL KREMERMAN, YURIY ZAYONTS, VLADISLAV ZARETSKIY, JOHN DOE DEFENDANTS 1 – 10, | |
| -and- | |
| NABIL AMHED ELHADIDY, M.D. | |
| Defendants. | |

-----------------------------------------------------------------X

**COMPLAINT**

Plaintiffs Government Employees Insurance Co., GEICO Indemnity Co., GEICO General Insurance Company and GEICO Casualty Co. (collectively "GEICO" or "Plaintiffs"), as and for their Complaint against the Defendants, hereby allege as follows:

**NATURE OF THE ACTION**

1.     This action seeks to recover more than $1,000,000.00 that the Defendants have improperly obtained from GEICO by submitting, and causing to be submitted, thousands of fraudulent no-fault insurance charges relating to medically unnecessary services that allegedly were rendered to individuals involved in automobile accidents and eligible for coverage under policies of automobile insurance that were issued by GEICO ("Insureds").

2.     Defendants perpetrated their fraud at issue in this Complaint through a scheme revolving around two physician, Ahmed Adel El Soury, M.D. ("Dr. El Soury"), a physical therapist, Samah Mohamed Mahmoud Shahen, P.T. ("Shahen")(collectively "Nominal Owners"), two professional corporations known as Recover Medical Services, PC ("RMS"), Outreach Rehab PT, PC ("Outreach")(collectively, the "PC Defendants"), as well as series of non-physician laypersons, Mikhail Zemlyansky ("Zemlyansky"), Michael Danilovich ("Danilovich"), Michael Barukin ("Barukin"), Vladislav Zaretskiy ("Zaretskiy") Mikhail Kremerman ("Kremerman"), and Yuriy Zayonts ("Zayonts"), (collectively the "Management Defendants") who secretly and unlawfully owned and controlled the professional corporations and Nabil Ahmed Elhadidy, M.D. ("Dr. Elhadidy"), and the treating physician, who purportedly performed a majority of the Fraudulent Services for RMS (Collectively, all referred to herein as the "Defendants.").

3.     In addition to seeking recovery of the improperly obtained monies, GEICO seeks a declaration that it is not legally obligated to pay reimbursement of more than $740,000.00 in

pending no-fault insurance claims that were submitted to GEICO by the Defendants in the names of the PC Defendants, for medically unnecessary and fraudulent services, including initial evaluations, electro-diagnostic testing, outcome assessment testing, computerized range of motion/muscle testing, physical therapy treatment and aquamed services (collectively, the "Fraudulent Services").

4.      The Management Defendants are all non-physicians who have each been parties to criminal proceedings for their involvement and participation in No-Fault insurance fraud schemes, including the illegal ownership and control of the clinic location where the PC Defendants rendered the services.   Virtually all of the Management Defendants have pled guilty to their involvement in one or more No-Fault insurance fraud schemes and recently, Zemlyansky was found guilty after trial, for his role as the mastermind behind various No-Fault insurance fraud schemes. See USA v. Zemlyansky, et al., Docket No. 1:12-cr-00171 (JPO)("Zemlyansky Action").

5.      As set forth in more detail below, GEICO is entitled to judgment in this action because:

> (i)      the PC Defendants were unlawfully incorporated, unlawfully owned and controlled by non-physicians and, therefore, were ineligible to bill for or to collect no-fault benefits;
>
> (ii)     the PC Defendants unlawfully split fees with non-physicians and, therefore, were ineligible to bill for or to collect no-fault benefits;
>
> (iii)    the Fraudulent Services were provided pursuant to illegal kickback arrangements among the Defendants and others;
>
> (iv)    the Fraudulent Services were not medically necessary and were provided pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them;
>
> (v)     the billing codes used for the Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO;

3

(vi)    Outreach is allegedly owned by a physical therapist who has never engaged in the practice of his profession through the professional corporation and, therefore, was never eligible to recover no-fault benefits;

(vii)    Outreach has no right to receive payment for any bills submitted to GEICO because the Defendants knowingly misrepresented the services rendered by Outreach so as to bill and collect fees from GEICO and other New York automobile insurers over and above the maximum permissible charges for physical therapy allowable under the New York State Workers' Compensation Fee Schedule; and

(viii)    in many cases, the Fraudulent Services were provided by independent contractors, rather than by the PC Defendants' employees.

6.    The Defendants fall into the following categories:

(i)    The PC Defendants are unlawfully incorporated New York professional corporations, through which the Fraudulent Services purportedly were performed and billed to insurance companies, including GEICO.

(ii)    Dr. El Soury is a licensed physician who falsely purports to own RMS.

(iii)    Shahen is a licensed physical therapist who falsely purports to own Outreach.

(iv)    The Management Defendants are not and never have been licensed physicians. Even so, they secretly and unlawfully owned, controlled, and derived economic benefit from the PC Defendants in contravention of New York law.

(v)    Dr. Elhadidy is a licensed physician that was associated with Defendants as an independent contractor, and who purported to perform many of the Fraudulent Services on behalf of RMS.

7.    As discussed below, Defendants at all relevant times have known that (i) the PC Defendants were unlawfully incorporated, illegally owned and controlled by non-physicians and, therefore, were ineligible to bill for or to collect no-fault benefits; (ii) the PC Defendants unlawfully split fees with non-physicians and, therefore, were ineligible to bill for or to collect no-fault benefits; (iii) the Fraudulent Services were not medically necessary and were provided pursuant to pre-determined fraudulent protocols designed solely to financially enrich the

4

Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them; (iv) the billing codes used to seek payment for the Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO; (v) the Fraudulent Services were provided pursuant to illegal kickback arrangements among the Defendants and others; (vi) Outreach is allegedly owned by Shahen who has never engaged in the practice of his profession through Outreach; and (vii) in many cases, the Fraudulent Services were provided by independent contractors, rather than by the PC Defendants' employees.

8.      As such, the Defendants do not now have – and never had – any right to be compensated for the Fraudulent Services that have been billed to GEICO through the PC Defendants.  The charts attached hereto as Exhibits "1" – "2" set forth a representative sample of the fraudulent claims that have been identified to date that the Defendants submitted, or caused to be submitted, to GEICO.  The Defendants' fraudulent scheme began as early as 2009 and has continued uninterrupted since that time.  As a result of the Defendants' scheme, GEICO has incurred damages of more than $1,000,000.00.

## THE PARTIES

### I.      Plaintiffs

9.      Plaintiffs Government Employees Insurance Co., GEICO Indemnity Co., GEICO General Insurance Company and GEICO Casualty Co., are all Maryland corporations with their principal places of business in Chevy Chase, Maryland. GEICO is authorized to conduct business and to issue policies of automobile insurance in the State of New York.

### II. Defendants

10.      Defendant Dr. El Soury is a physician who has been licensed to practice medicine in New York since November 26, 2004.  Dr. El Soury resides in and is a citizen of the State of

New Jersey. Dr. El Soury at all relevant times has served as the nominal or "paper" owner of RMS.

11.     Defendant Shahen is a physical therapist, who has been licensed to practice physical therapy in New York since October 6, 2006. Shahen resides in and is a citizen of the State of New York. Shahen at all relevant times has served as the nominal or "paper" owner of Outreach.

12.     Defendant RMS is an unlawfully incorporated New York medical professional corporation with its principal place of business in New York. RMS is the entity through which many of the Fraudulent Services have been billed to New York automobile insurance companies, including GEICO. RMS was unlawfully incorporated on November 9, 2009, and nominally is owned on paper by Dr. El Soury, but in actuality always has been owned and controlled by non-physicians in contravention of New York law.

13.     Defendant Outreach is anunlawfully incorporated New York physical therapy professional corporation with its principal place of business in New York. Outreach is another entity which many of the Fraudulent Services have been billed to insurance companies, including GEICO. Outreach was unlawfully incorporated on November 24, 2008, and nominally is owned on paper by Shahen, but in actuality always has been owned and controlled by non-licensed persons in contravention of New York law.

14.     Defendant Zemlyansky resides in and is a citizen of New York. Zemlyansky is not and never has been a licensed physician or healthcare professional, yet nonetheless owned, controlled, and derived economic benefit from the PC Defendants in contravention of New York law.

15.     Defendant Danilovich resides in and is a citizen of New York. Danilovich is not and never has been a licensed physician or healthcare professional, yet nonetheless owned, controlled, and derived economic benefit from the PC Defendants in contravention of New York law.

16.     Defendant Barukin resides in and is a citizen of New York. Barukin is not and never has been a licensed physician or healthcare professional, yet nonetheless owned, controlled, and derived economic benefit from the PC Defendants in contravention of New York law.

17.     Defendant Zayonts resides in and is a citizen of New York. Zayonts is not and never has been a licensed physician or healthcare professional, yet nonetheless owned, controlled, and derived economic benefit from the PC Defendants in contravention of New York law.

18.     Defendant Kremerman resides in and is a citizen of New York. Kremerman is not and never has been a licensed physician or healthcare professional, yet nonetheless owned, controlled, and derived economic benefit from the PC Defendants in contravention of New York law.

19.     Defendant Zaretskiy resides in and is a citizen of New York. Zaretskiy is not and never has been a licensed physician or healthcare professional, yet nonetheless owned, controlled, and derived economic benefit from the PC Defendants in contravention of New York law.

20.     Upon information and belief, John Doe Defendants 1 –10 reside in and are citizens of New York. John Doe Defendants 1–10 are individuals and entities, presently not identifiable, who are not and never have been licensed as physicians or healthcare professionals, yet together with Zemlyansky, Danilovich, Barukin, Zaretskiy, Kremerman, Zayonts have owned, controlled, and derived economic benefit from the PC Defendants in contravention of New York law.

21.     Defendant Dr. Elhadidy is a physician, who has been licensed to practice medicine in New York since December 10, 1993.  Upon information and belief, at all relevant times Dr. Elhadidy resided in and was a citizen of the State of New York.  At all relevant times, Dr. Elhadidy was associated with RMS as an independent contractor, and purported to perform many of the Fraudulent Services on behalf of RMS.

## JURISDICTION AND VENUE

22.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1332(a)(1) because the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs, and is between citizens of different states.  Pursuant to 28 U.S.C. § 1331, this Court also has jurisdiction over the claims brought under 18 U.S.C. §§ 1961 et seq. (the Racketeer Influenced and Corrupt Organizations ("RICO") Act because they arise under the laws of the United States.  In addition, this Court has supplemental jurisdiction over the subject matter of the claims asserted in this action pursuant to 28 U.S.C. § 1367.

23.     Venue in this District is appropriate pursuant to 28 U.S.C. § 1391, as the Eastern District of New York is the District where one or more of the Defendants reside and because this is the District where a substantial amount of the activities forming the basis of the Complaint occurred.

## ALLEGATIONS COMMON TO ALL CLAIMS

I.     **An Overview of the No-Fault Laws and Licensing Statutes**

24.     GEICO underwrites automobile insurance in New York.

25.     New York's no-fault laws are designed to ensure that injured victims of motor vehicle accidents have an efficient mechanism to pay for and receive the health care services that they need.  Under New York's Comprehensive Motor Vehicle Insurance Reparations Act (N.Y. Ins. Law §§ 5101, et seq.) and the regulations promulgated pursuant thereto (11 N.Y.C.R.R. §§ 65,

et seq.) (collectively referred to as the "No-Fault Laws"), automobile insurers are required to provide Personal Injury Protection Benefits ("No-Fault Benefits") to Insureds.

26.     No-Fault Benefits include up to $50,000.00 per Insured for necessary expenses that are incurred for healthcare goods and services, including physician services, chiropractic services, physical therapy services, and acupuncture services.

27.     An Insured can assign his/her right to No-Fault Benefits to health care goods and services providers in exchange for those services.  Pursuant to a duly executed assignment, a health care provider may submit claims directly to an insurance company and receive payment for medically necessary services, using the claim form required by the New York State Department of Insurance (known as "Verification of Treatment by Attending Physician or Other Provider of Health Service" or, more commonly, as an "NF-3").  In the alternative, a healthcare provider may submit claims using the Health Care Financing Administration insurance claim form (known as the "HCFA-1500 form").

28.     Pursuant to the No-Fault Laws, professional corporations are not eligible to bill for or to collect No-Fault Benefits if they are unlawfully incorporated or fail to meet any New York State or local licensing requirements necessary to provide the underlying services.

29.     The implementing regulation adopted by the Superintendent of Insurance, 11 N.Y.C.R.R. § 65-3.16(a)(12) states, in pertinent part, as follows:

> A provider of health care services is not eligible for reimbursement under section 5102(a)(1) of the Insurance Law if the provider fails to meet any applicable New York State or local licensing requirement necessary to perform such service in New York … .

30.     In New York, only a licensed healthcare professional may: (i) practice the pertinent healthcare profession; (ii) own and control a professional corporation authorized to operate a professional healthcare practice; (iii) employ and supervise other healthcare professionals; and (iv) absent statutory exceptions not applicable in this case, derive economic benefit from healthcare

professional services. Unlicensed individuals may not: (i) practice the pertinent healthcare profession; (ii) own or control a professional corporation authorized to operate a professional healthcare practice; (iii) employ or supervise healthcare professionals; or (iv) absent statutory exceptions not applicable in this case, derive economic benefit from professional healthcare services.

31.    New York law prohibits licensed healthcare providers from paying or accepting kickbacks in exchange for patient referrals.

32.    Additionally, New York law requires that the shareholders of a professional corporation be engaged in the practice of the profession through the professional corporation in order for it to be lawfully licensed.

33.    Therefore, under the No-Fault Laws, a professional corporation is not eligible to receive No-Fault Benefits if, among other things: (i) it is unlawfully incorporated; (ii) it is fraudulently licensed; (iii) it is owned by a professional who does not practice the profession through it; (iv) it engages in unlawful fee-splitting with unlicensed non-professionals; (v) or if it pays or receives unlawful kickbacks in exchange for patient referrals.

34.    In State Farm Mut. Auto. Ins. Co. v. Mallela, 4 N.Y.3d 313, 320 (2005), the New York Court of Appeals confirmed that healthcare providers that fail to comply with licensing requirements are ineligible to collect No-Fault Benefits, and that insurers may look beyond a facially-valid license to determine whether there was a failure to abide by state and local law.

35.    Pursuant to the No-Fault Laws, only healthcare services providers in possession of a direct assignment of benefits are entitled to bill for and collect No-Fault Benefits. There is both a statutory and regulatory prohibition against payment of No-Fault Benefits to anyone other than the patient or his/her healthcare services provider. The implementing regulation adopted by the Superintendent of Insurance, 11 N.Y.C.R.R. § 65-3.11, states – in pertinent part – as follows:

10

> An insurer shall pay benefits for any element of loss … directly to the applicant or … upon assignment by the applicant ... shall pay benefits directly to providers of healthcare services as covered under section five thousand one hundred two (a)(1) of the Insurance Law …

36.     Accordingly, for a healthcare provider to be eligible to bill for and to collect charges from an insurer for healthcare services pursuant to Insurance Law § 5102(a), it must be the actual provider of the services. Under the No-Fault Laws, a professional corporation is not eligible to bill for services, or to collect for those services from an insurer, where the services were rendered by persons who were not employees of the professional corporation, such as independent contractors.

37.     Pursuant to New York Insurance Law § 403, the NF-3s and HCFA-1500 Forms submitted by a healthcare provider to GEICO, and to all other automobile insurers, must be verified by the health care provider subject to the following warning:

> Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime.

## II.    The Workers Compensation Fee Schedule and Physical Medicine Ground Rules

38.     The New York Workers' Compensation Board has established a schedule of fees which is known more commonly as the Workers' Compensation Medical Fee Schedule (hereinafter the "Fee Schedule"). The Fee Schedule has been in existence for more than twenty (20) years.

39.     The Fee Schedule is the reference tool by which both healthcare providers and automobile insurers measure the level of reimbursement payable on legitimate claims. The purpose of the Fee Schedule is twofold: (i) to provide comprehensive billing guidelines in order to allow healthcare providers to appropriately describe their services and minimize disputes over reimbursement through the establishment of maximum permissible fees that can be charged for

services included in the Fee Schedule, and (ii) to protect Insureds from having their medical benefit limits artificially eroded by capping the charges that are subject to payment by automobile insurers.

40.     Section 5102(a)(1) of the No-Fault Law defines "basic economic loss" as including "all necessary expenses incurred for…professional health services," that are "subject to the limitations of" Insurance Law § 5108.

41.     Insurance Law § 5108(b) provides that the Superintendent of Insurance "shall promulgate rules and regulations implementing and coordinating the provisions of" the No-Fault Law and the Workers' Compensation Law "with respect to charges for the professional health services specified in" Insurance Law § 5102(a)(2), "including the establishment of schedules for all such services for which schedules have not been prepared and established by the chairman of the workers' compensation board."  In addition, §5108(a) provides that the "charges for services specified in" §5102(a)(1) "shall not exceed the charges permissible under the schedule prepared and established by the chairman of the workers' compensation board."

42.     Furthermore, When the Superintendent does not establish a fee schedule, health services fees are governed by Section 68.5(b) of Regulation 83, which states that:

> [I]f the superintendent has not adopted or established a fee schedule applicable to the provider, then the permissible charge for such service shall be the prevailing fee in the geographic location of the provider subject to review by the insurer for consistency with charges permissible for similar procedures under schedules already adopted or established by the superintendent. (Emphasis added.)

Therefore, when a healthcare provider seeks reimbursement for a service that is not assigned a procedure code by the Fee Schedule, an insurer may objectively assign to the procedure a value that appropriately reflects the actual service rendered to the Insured.

**III.     Criminal Proceedings Involving the Management Defendants**

43.     The Management Defendants already have been indicted for their participation in various healthcare and mail fraud schemes including, upon information and belief, their participation in the fraudulent scheme at 62-14 24th Avenue, Brooklyn ("24[th] Avenue Location") giving rise to this Complaint.

44.     In February 2012, an indictment (the "February 2012 Indictment") in USA v. Zemlyansky, et al., Docket No. 1:12-cr-00171 (JPO)(the "Zemlyansky Action") was unsealed in the United States District Court for the Southern District of New York, charging Zemlyansky, Danilovich, Barukin, Zayonts, Kremerman, Zaretskiy, among others, with RICO Conspiracy, Conspiracy to Commit Health Care Fraud, Conspiracy to Commit Mail Fraud, and Conspiracy to Commit Money Laundering.  A copy of the February 2012 Indictment is annexed hereto as Exhibit "3."

45.     Among other things, the February 2012 Indictment alleges facts indicating that, between 2007 and 2012:

(i)     A group of unlicensed non-physicians – including Zemlyansky, Danilovich, Barukin, Zayonts, Kremerman, Zaretskiy – caused a series of professional corporations to be unlawfully incorporated and to commence operations from various clinics that they controlled throughout the metropolitan New York City area.

(ii)    While purporting to be legitimate medical care clinics specializing in the treatment of accident victims, the professional corporations operating from the clinics actually were medical fraud mills that routinely billed automobile insurance companies for medical treatments that never were provided or that were medically useless.

(iii)   The purported physician-owners of the professional corporations operating from the clinics actually were nothing more than salaried employees who took direction from the unlicensed non-physicians, including Zemlyansky, Danilovich, Barukin, Zayonts, Kremerman, Zaretskiy.

(iv)    In exchange for kickbacks, the unlicensed non-physicians who truly owned the unlawfully incorporated professional corporations operating from the clinics –

including Zemlyansky, Danilovich, Barukin, Zayonts, Kremerman, Zaretskiy – would arrange for Insureds to be referred for additional illusory or medically-useless treatments to other unlawfully incorporated professional corporations that also operated from the clinics.

See Exhibit "3."

46.     On October 26, 2012, the United States Attorney filed opposition papers in the Zemlyansky Action setting forth a non-exclusive list of the unlawfully incorporated professional corporations set up by the defendants "for the sole purpose of defrauding insurance companies in the State of New York." A copy of the Government's October 26, 2012 Opposition, with attached list of the PCs used to commit fraud, is annexed hereto as Exhibit "4."

47.     According to the United States Attorney's list, at least 6 medical providers who operated from the 24th Avenue Location during the same time period as the PC Defendants were identified as professional corporations that were used in furtherance of the fraudulent scheme to defraud insurance companies.  See Exhibit "4."

48.     In addition, the Government identified another professional corporation allegedly owned by Dr. El Soury that was used in furtherance of the fraudulent scheme to defraud insurance companies.  Specifically, the Government identified an entity known as Victory Medical Diagnostics, P.C. as being controlled and operated by Zayonts, Kremerman and Zaretskiy. See Exhibit "4."

49.     In the criminal proceedings following the February 2012 Indictment, there has been significant evidence presented that the suspect professional corporations received a steady stream of patients through no effort of their own or by the "paper owners" of those suspect professional corporations.  Instead, patients are procured, referred and/or directed to the professional corporations through the use of "runners," payments to Insureds, kickbacks, and illegal fee-splitting relationships.

14

50.     Defendants, Barukin, Zayonts, Kremerman and Zaretskiy have since pled guilty to their respective roles in the fraudulent schemes, and collectively have been required to forfeit in excess of $3,000,000.00 as payment for the money judgment in the plea agreements. Additionally, Zayonts, Kremerman and Zaretskiy, as part of their plea deals were required to pay restitution specifically from Victory Medical Diagnostics, P.C. bank accounts they controlled, thus suggesting that Dr. El Sour was not in control of the corporate bank accounts. See USA v. Zemlyansky, et al., Docket No. 1:12-cr-00171 (JPO)(Docket Nos. 680, 973, 1098, 1209, 1210, 1227, 1287).

51.     On March 20, 2015, after trial, a jury found Zemlyansky guilty of among other things, RICO Conspiracy, Mail Fraud, Wire Fraud, and Money Laundering based on the charges in the February 2012 Indictment. See USA v. Zemlyansky, et al., Docket No. 1:12-cr-00171 (JPO)(Docket No. 1539).

**IV.     The Fraudulent Scheme**

52.     Beginning in 2009 and continuing through the present day with the attempt to collect on the accounts receivables of the PC Defendants, the Defendants masterminded and implemented a complex fraudulent scheme in which the PC Defendants have been used to bill the New York automobile insurance industry millions of dollars for medically unnecessary services and services.

53.     The Management Defendants recruited Dr. El Soury and Shahen to essentially "sell" their licenses to them so that they could fraudulently incorporate the professional corporations and use them to submit large-scale fraudulent billing to insurers.  In his time as the nominal owner of Outreach, Shahen never rendered physical therapy services through Outreach nor did he spend any significant time physically present at the 24th Avenue Location.  True ownership and control of the PC Defendants rested at all times entirely with the Management

Defendants, who used the façade of the professional corporations to do indirectly what they are forbidden from doing directly, namely: (i) employing physicians and other medical professionals; (ii) controlling the medical practices; and (iii) charging for and deriving an economic benefit from the PC's services.

54.     The Management Defendants organized the PC Defendants to operate from the 24th Avenue Location, a location that they themselves operated from and controlled.  By causing the PC Defendants to operate solely out of the 24th Avenue Location, the Management Defendants could control the modalities, referrals, employees (such as Dr. Elhadidy) and medical services provided by the PC Defendants (as well as a cadre of other professional entities) and cause insureds to be subject to a cookie-cutter pattern of predetermined treatment crafted solely to maximize profits at the expense of true patient care.

55.     The Management Defendants provided a steady stream of patients to the PC Defendants through the use of "runners," referral relationships with attorneys, and other illegal financial arrangements with medical practitioners.  Dr. El Soury, Shahen and Dr. Elhadidy knew and understood that they could only gain access to the 24th Avenue Location and the steady stream of patients generated through "runners" and other illegal financial arrangements if they ceded control of the PC and paid financial incentives and kickbacks to the Management Defendants.

56.     The Management Defendants also provided a stable of medical practitioners, including Dr. Elhadidy to provide medical services on behalf of the PC Defendants and caused the PC Defendants to illegally refer patients between the PC Defendants solely to enrich their financial gain.

57.   The monies that the Management Defendants were paid were disguised as ostensibly legitimate fees to "rent" space or personnel, management agreements, billing agreements, marketing agreements, transportation fees and/or other sham agreements.

**A.  The Fraudulent Incorporation and Operation of the PC Defendants**

58.   The Management Defendants have a history of fraudulently incorporating professional corporations under the names of various medical professionals, and then using them to submit large-scale fraudulent no-fault billing to automobile insurers. As detailed in the February 2012 indictment, the Management Defendants have engaged in this type of fraudulent scheming, including at the 24th Avenue Location, for many years.

59.   In 2009, the Management Defendants commenced a search for a licensed physician who would be willing to sell the use of his medical license to them so that they could continue to exploit their fraudulent scheme at the 24th Avenue Location, by providing a turnkey medical practice over to a new doctor so they could continue to use the 24th Avenue location to submit large-scale fraudulent no-fault billing to insurers.

60.   In exchange for a designated salary or other form of compensations Dr. El Soury and Shahen agreed to falsely represent in the certificates of incorporation filed with the Department of Education and all other corporate paperwork, that they were the true shareholders, directors and officers of the PC Defendants.

61.   Once the PC Defendants began rendering services at the 24th Avenue Location, true beneficial ownership and control over the professional corporations was transferred to the Management Defendants.

62.   The Management Defendants provided all start-up costs and investment in the PC Defendants.  As the PC Defendants entered a turnkey operation, they did not incur any costs to

establish the PC Defendants practices, nor did they invest any money in the professional corporations they purportedly owned.

63.    The PC Defendants did not have an internet website or appear to advertise for patients and did virtually nothing that would be expected of a legitimate medical "practice" to develop its reputation and attract patients.

64.    The PC Defendants likewise never genuinely advertised for patients; never sought to build up name recognition for the PC Defendants to draw business; and never made any legitimate effort to generate patients. In fact, Dr. El Soury and Shahen were rarely – if ever – present at the 24th Avenue Location and Shahen never provided any form of services to patients on behalf of Outreach.

65.    The Nominal Owners exercised absolutely no control over the PC Defendants. All decision-making authority relating to the operation and management of the PC Defendants was vested entirely with the Management Defendants. In addition, the Nominal Owners never controlled or maintained any of the PC Defendants' books or records, including its bank accounts; and never selected, directed, and/or controlled any of the individuals or entities responsible for handling any aspect of the PC Defendants' financial affairs.

66.    The treating physicians/practitioners, including Dr. Elhadidy, also essentially worked for the Management Defendants and not the PC Defendants.  The treating individuals were essentially hired and scheduled by the Management Defendants.  As Shahen was never present at the location, the treating individuals for Outreach reported directly to the Management Defendants.  The Management Defendants would then use their control over the PC Defendants to control the treatment and billing protocols in order to derive economic benefit from their services.

67.    To conceal their true ownership and control of the PC Defendants while simultaneously effectuating pervasive, total control over its operation and management, the Management Defendants arranged to have the Nominal Owners and PC Defendants enter into a series of "management," "billing," "marketing," and/or "lease" agreements with themselves. These agreements called for exorbitant payments from the PC Defendants to the Management Defendants, for the alleged performance of certain designated services including management, marketing, billing, and/or collections regardless of: (i) the volume of the PC Defendants' business; or (ii) the income generated by the professional corporations.

68.    While these agreements ostensibly were created to permit the Management Defendants to provide "management," "billing," and/or "marketing," services, or facility space and equipment, they actually were used solely as a tool to permit the Management Defendants to: (i) control the day-to-day operations, exercise supervisory authority over, and illegally own the PC Defendants; and (ii) to siphon all of the profits that were generated by the billings submitted to GEICO and other insurers through the PC Defendants.

69.    The net effect of these "management," "billing," "marketing," and/or "lease" agreements between the Nominal Owners, PC Defendants and the Management Defendants was to maintain the PC Defendants in a constant state of debt to the Management Defendants, thereby enabling the Management Defendants to maintain total control over the professional corporation, its accounts receivable, and any revenues that might be generated therefrom.

70.    The unlawful ownership and control of the PC Defendants by non-physicians compromised patient care, as the provision of health services by the PC Defendants was subject to the pecuniary interests of non-physicians as opposed to the independent medical judgment of a true doctor-owner.

**B. Shahen's Failure to Practice Medicine Through Outreach**

71.     N.Y. Business Corporation Law § 1507 makes clear that a shareholder of a professional corporation must be engaged in the practice of the profession through the professional corporation for it to be lawfully licensed. Section 1507 provides as follows:

> **Issuance of shares**
>
> A professional service corporation may issue shares only to individuals who are authorized by law to practice in this state a profession which such corporation is authorized to practice and who are or have been engaged in the practice of such profession in such corporation…or who will engage in the practice of such profession in such corporation within thirty days of the date such shares are issued….All shares issued, agreements made, or proxies granted in violation of this section shall be void.

72.     Legislative history confirms that a professional corporation's putative physician-owner not only must be licensed to practice in that profession but must also be engaged in the practice of the profession through the professional corporation.  For example, in commenting on the proposed amendment to Section 1507 in 1971, the State Education Department stated:

> This bill amends the Business Corporation Law in relation to the operation of professional service corporations.  While this bill allows more flexibility in the ownership and transfer of professional service corporation stock, it maintains the basic concept of restricting ownership to professionals working within the corporation.

73.     Similarly, the New York Department of State commented that:

> Section 1507 currently limits issuance of shares in such corporation to persons licensed by this State to practice the profession which the corporation is authorized to practice and who so practice in such corporation or a predecessor entity.
>
> The bill would add a third category of person eligible to receive stock, one who will practice such profession "within 30 days of the date such shares are issued."

74.     New York's Department of Health was of the same opinion, commenting that:

> The bill would amend Article 15 of the Business Corporation Law pertaining to professional service corporations to allow the issuance of shares of individuals who will engage in the practice of the profession within 30 days of the date such shares are issued, in addition to those presently so engaged…. (Emphasis added.)

Copies of the memoranda are annexed hereto as Exhibit "5."

75.     In keeping with the fact that Shahen had no actual ownership interest in or control over Outreach, Shahen did not actually practice physical therapy through Outreach.

76.     Shahen did not personally treat or provide testing services to any patient of Outreach; did not supervise any of the treatment or testing services allegedly provided to patients of Outreach; and did not train any of the treating individuals that allegedly perform services on patients for Outreach.

77.     For example, not a single one of the hundreds of bills that have been submitted to GEICO for reimbursement by Outreach have been for services that were actually performed by Shahen.

78.     Contrary to the representations in the billings that were submitted, to the extent that the Fraudulent Services were performed under Outreach, the services were performed by physical therapists and individuals other than Shahen, who were associated with Outreach only as mere independent contractors hired and controlled by the Management Defendants.

**C.  The Fraudulent Treatment and Billing Protocols**

79.     The PC Defendants have been used by the Defendants to implement and execute upon a complex fraudulent scheme designed to bill GEICO and the New York automobile insurance industry millions of dollars for medically useless healthcare services.

80.     Regardless of the severity of any Insured's accident, to the extent that they were involved in any actual accidents at all, and regardless of the severity of any Insured's injuries, to the extent they were injured at all, the PC Defendants purported to subject virtually every Insured to an identical, medically unnecessary course of "treatment" that was provided pursuant to a pre-determined, fraudulent protocol designed to maximize the billing that could be submitted through the PC Defendants to insurers, including GEICO.

81.    The Defendants also masterminded a fraudulent scheme whereby many of the GEICO Insured were referred by RMS for aquamed physical therapy services at Outreach.  Such referrals were made – and the aquamed physical therapy services performed – solely in order to unlawfully manipulate the N.Y.S. Workers' Compensation Fee Schedule in order to seek reimbursement beyond that to which the Defendants were lawfully entitled.

82.    The PC Defendants purported to provide their pre-determined fraudulent treatment protocol to Insureds without regard for the Insureds' individual symptoms or presentment, to the extent treatment was provided at all.

**1.   The Use of Runners and Kickbacks**

83.    Upon information and belief, the Management Defendants used individuals known as "Runners" who recruited patients to come to the clinics for treatment.   The Management Defendants paid these Runners cash kickbacks for each patient referral.

84.    Under the direction and control of the Management Defendants, and often with coaching by the Runners, the patients that were recruited to come to the 24th Avenue Location were subjected to a medically unnecessary course of "treatment" that was provided pursuant to a pre-determined, fraudulent protocol designed to maximize the billing that could be submitted to insurers.

85.    The kickbacks that the Management Defendants were given to provide access to the PC Defendants were disguised as ostensibly legitimate fees to "rent" space or personnel at the clinics. In fact, these were "pay-to-play" arrangements that caused the Management Defendants to directly and/or indirectly to provide access to Insureds and to steer the Insureds to the PC Defendants for the medically unnecessary Fraudulent Services, with the amount of the payments to be made based upon the volume of Insureds that were referred to the PC Defendants for "treatment."

86.     The February 2012 Indictment explained the mechanics of the suspect No-Fault clinics' operations as follows:

> 4.  In order to take advantage of the patient-friendly provisions of the No-Fault Law, numerous medical clinics were created solely to defraud insurance companies under the No-Fault Law (the "No-Fault Clinics").  While purporting to be legitimate medical care clinics specializing in treating the Patients, the No-Fault Clinics were, in fact, medical fraud mills that routinely billed automobile insurance companies under the No-Fault Law for medical treatments that were either (i) never provided and/or (ii) unnecessary, because the Patients did not medically need the treatments.

See Exhibit "3."

87.     The February 2012 Indictment explained the use of Runners and the kickback procedure as follows:

> 7.  [T]he [individuals who controlled the Clinics] arranged for other . . . entities to provide excessive and unnecessary medical treatments based on referrals from the No-Fault Doctors (the "Modality Clinics").  The Modality Clinics [such as the PC Defendants in the present case] provided additional medical treatments and supplies, which were fraudulently billed to the automobile insurance companies. In return, the [individuals who controlled the Clinics] received cash kickbacks for each referral from other individuals who . . . owned, operated and controlled the Modality Clinics (the "Modality Clinic Controllers") [such as the Management Defendants in the present case].

> 8.  …[T]he No-Fault Clinic Controllers used individuals who recruited Patients to the No-Fault Clinics (the "Runners").  The No-Fault Clinic Controllers generally paid the Runners between $2,000 and $3,000 per Patient referral...   Often the Runners coached the Patients about which fake injuries they should claim….

> *       *

> 11. [A]s described above, the Modality Clinic Controllers paid kickbacks to the [individuals who controlled the Clinics] in return for Patient referrals.  The Modality Clinic Controllers paid a portion of the kickback money to the [individuals who controlled the Clinics] by providing checks to, the No-Fault Clinic Accounts that were often falsely characterized as "rent" payments for the use of space at the No-Fault Clinics by the Modality Clinics. These "rent" checks had the dual purpose of satisfying some of the monies owed for kickbacks and also falsely representing to the automobile insurance companies that the business relationship between the No-Fault Clinics and the Modality Clinics was legitimate. Additionally, other expenses of the No-Fault Clinics were sometimes paid by check directly from the Modality Clinic Accounts as an additional means of making kickback payments to the [individuals who controlled the No-Fault

Clinics].   Finally, on some occasions, the Modality Clinic Controllers paid a portion of the kickbacks owed to the [individuals who controlled the No-Fault Clinics] by structuring checks of less than $10,000 to the [individuals who controlled the No-Fault Clinics], who, among other things, provided some of these checks to check cashers to convert to cash . . . .

See Exhibit "3."

88.     The use of Runners and the unlawful kickback relationships were essential to the success of the Defendants' fraudulent scheme. The Defendants derived significant financial benefit from these relationships because without the access to the Insureds provided by the Runners, the referring providers and/or other clinic controllers, the Defendants would not have the ability to implement their fraudulent treatment and billing protocol, bill automobile insurers including GEICO, or generate income from insurance claim payments.

### 2.   The Fraudulent Initial Consultations

89.     Pursuant to the Management Defendants' directives and their pre-determined fraudulent treatment protocol, RMS purported to provide virtually every Insured with an initial consultation.

90.     The Defendants then typically billed the initial consultations through RMS to GEICO under current procedural terminology ("CPT") code 99244, resulting in a charge of $236.95.   The use of CPT code 99244 typically requires that the physician spend 60 minutes of face-to-face time with the Insured or the Insured's family.

91.     The charges for the initial consultations were fraudulent in that (i) the initial consultations were medically unnecessary and were performed pursuant to the Management Defendants' direction and control; (ii) the initial consultations misrepresented the extent of the initial consultations and the nature of the underlying service; and (iii) the initial consultations virtually never took 60 minutes to perform, to the extent that they were conducted at all.

92.     According to the New York Workers' Compensation Medical Fee Schedule (the "Fee Schedule"), which is applicable to claims for No-Fault Benefits, the use of CPT code 99244 represent that the physician has performed a consultation at the request of another physician or other appropriate source.

93.     RMS did not provide their initial examination at the request of any other physicians or other appropriate sources.  Rather, to the extent that the initial consultations were performed in the first instance, they were performed solely as part of the Defendants' fraudulent treatment protocol.

94.     Furthermore, the Defendants' use of CPT code 99244 represented that the physicians who purportedly conducted the consultations submitted a written consultation report to the physicians or other appropriate sources who purportedly requested the consultations in the first instance.

95.     Though RMS routinely billed for the initial consultations under CPT code 99244, they never submitted any written consultation report to any physician or other referring healthcare provider, because the initial consultations were not conducted pursuant to any genuine request from any referring healthcare provider.

96.     Furthermore, according to the Fee Schedule, the use of CPT code 99244 typically requires that the Insured presented with problems of moderate-to-high severity.

97.     Though RMS routinely billed for the initial consultations under CPT code 99244, the Insureds almost never presented with problems of moderate-to-high severity as the result of any automobile accident.  In addition, the use of CPT code 99244 typically requires that the physician spend 60 minutes of face-to-face time with the Insured or the Insured's family.

98.   Though RMS routinely billed for the initial consultations under CPT code 99244, no physician associated with RMS spent 60 minutes with any Insureds during the initial consultations.

99.   Furthermore, though RMS routinely falsely represented that their initial consultations involved medical decision-making of "moderate to high complexity," in actuality the initial consultations did not involve such decision-making.

100.   In keeping with the fact that the initial examinations never lasted 60 minutes, RMS used boilerplate forms in conducting the initial examinations, setting forth a very limited range of potential patient complaints, examination/diagnostic testing options, potential diagnoses, and treatment recommendations.

101.   All that was required to complete the boilerplate forms was a brief patient interview and a brief physical examination of the Insureds, consisting of a check of some of the Insureds' vital signs, and basic range of motion and muscle strength testing.

102.   These interviews and examinations did not require any physicians associated with RMS to spend more than 60 minutes of face-to-face time with the Insureds.

103.   The initial examinations do not genuinely reflect the Insureds' actual circumstances, and instead are designed solely to support a laundry-list of fraudulent services that the Defendants purport to perform and then bill to GEICO and other insurers.

104.   Additionally, in virtually every instance in which an insured received an initial examination from Dr. El Soury and subsequently a neurological examination performed by Dr. Elhadidy, the two examinations would never correlate in terms of diagnosis and treatment plans, suggesting Dr. Elhadidy's examinations were reported in such a way as to justify the performance of EDX testing on an insured.

105.    Thereafter, the Defendants direct Insureds to return to the Defendants several times per week for medically unnecessary follow-up examinations, physical therapy, electrodiagnostic testing as well as a laundry list of otherwise medically unnecessary services.

### 3.    The Fraudulent Follow-Up Examinations

106.    In addition to the fraudulent initial examinations, the Defendants typically purported to subject Insureds to multiple fraudulent follow-up examinations during the course of their fraudulent treatment protocol at RMS.

107.    RMS then virtually always billed the follow-up examinations to GEICO under CPT code 99214, resulting in a charge of $71.49 for each follow-up examination that RMS purported to provide.

108.    Furthermore, the charges for the follow-up examinations were fraudulent in that they misrepresented the extent of the examinations.

109.    Pursuant to the Fee Schedule, the use of CPT code 99214 typically requires that the Insured present with problems of moderate to high severity.

110.    Though RMS routinely billed for the follow-up examinations using CPT code 99214, the Insureds almost never presented with problems of moderate to high severity or even low to moderate severity. Rather, to the extent that the Insureds had any problems at all as the result of any automobile accidents, the problems were of low severity.

111.    Furthermore, the use of CPT code 99214 typically requires that the physician spend 25 minutes face-to-face with the patient and/or the patient's family.

112.    Though RMS routinely billed for the follow-up examinations under CPT code 99214, no physician associated with RMS ever spent 25 minutes, on the follow-up examinations.

113.    RMS used pre-printed template and checklist forms in conducting the follow-up examinations. The boilerplate template and checklist forms that RMS used in conducting the

follow-up examinations set forth a very limited range of potential patient complaints, examination/diagnostic testing options, potential diagnoses, and treatment recommendations.

114.     All that was required to complete the boilerplate template and checklist forms was a brief patient interview and a brief physical examination of the Insureds, consisting of a check of some of the Insureds' vital signs, and basic range of motion and muscle strength testing.

115.     Pursuant to the Fee Schedule, when RMS submitted charges under CPT code 99214, they falsely represented that they: (i) conducted a "detailed" physical examination; and (ii) engaged in medical decision-making of "moderate complexity".

116.     Pursuant to the Fee Schedule, a physical examination does not qualify as "detailed" unless the healthcare provider conducts an extended examination of the affected body areas and other symptomatic or related organ systems.

117.     Though RMS routinely billed for the follow-up examinations under CPT code 99214, and therefore falsely represented that they conducted a "detailed" physical examination of Insureds during the follow-up examinations, they never conducted an extended examination of the affected body areas and other symptomatic or related organ systems

118.     Rather, the outcome of the follow-up examinations was pre-determined for virtually every Insured to reiterate the phony boilerplate "diagnoses" of sprains/strains and contusions that were provided to the Insureds during the initial examinations.

### 4. The Fraudulent Unbundling of Examinations and Billing for Outcome Assessment Tests

119.     In virtually all cases, RMS fraudulently unbundled their charges for the initial and follow-up examinations, by submitting a separate charge of $157.17 under CPT code 99358 for "Outcome Assessment Tests" provided contemporaneously with the initial and follow-up examinations.

28

120.    The Outcome Assessment Tests that RMS purported to provide to Insureds were simply pre-printed, multiple-choice questionnaires on which the Insureds were invited to report the symptoms they purportedly were experiencing and the impact of those symptoms on their lives. The Insureds' responses to the questionnaires then were fed into a computer, which automatically generated a report that rated the Insureds' responses according to pre-set criteria.

121.    Since a patient history and physical examination must be conducted as an element of a soft-tissue trauma patient's initial and follow-up examinations, and since the Outcome Assessment Tests that RMS purported to provide were nothing more than questionnaires regarding the Insureds' history and physical condition, the Fee Schedule provides that the Outcome Assessment Tests are to be reimbursed as an element of the initial examinations and follow-up examinations.

122.    In other words, healthcare providers cannot conduct and bill for an initial examination or follow-up examination, then bill separately for the type of contemporaneously-provided Outcome Assessment Tests that RMS purported to provide.

123.    The information gained through the use of the Outcome Assessment Tests that RMS purported to provide was not significantly different from the information that RMS purported to obtain during virtually every Insured's initial examination and follow-up examinations.

124.    Under the circumstances employed by RMS, the Outcome Assessment Tests represented purposeful and unnecessary duplication of the patient histories and examinations purportedly conducted during the virtually every Insured's initial examination and follow-up examination.

125.    The Outcome Assessment Tests were part and parcel of the Defendants' interrelated fraudulent scheme, inasmuch as the "service" was rendered pursuant to a pre-

determined protocol that: (i) in no way aided in the assessment and treatment of the Insureds; and (ii) was designed solely to financially enrich the Defendants.

126.    RMS' use of CPT code 99358 to bill for the Outcome Assessment Tests also constituted a deliberate misrepresentation of the extent of the service that was provided.

127.    Pursuant to the Fee Schedule, the use of CPT code 99358 represents – among other things – that a physician actually has spent at least one hour performing some prolonged service, such as review of extensive records and tests, or communication with the patient and his or her family.

128.    Though RMS routinely submitted billing for the Outcome Assessment Tests under CPT code 99358, they did not spend any time whatsoever reviewing or administering the tests, much less one hour.

129.    Upon information and belief, RMS' charges for the Outcome Assessment Tests also misrepresented the identity of the individual who performed the Outcome Assessment Tests.

130.    Pursuant to the Fee Schedule, the use of CPT code 99358 represents that the underlying service actually was performed by a physician or other licensed healthcare provider, and all of that RMS' charges for "outcome assessment testing" represented that a licensed physician performed the underlying service.

131.    However, the Outcome Assessment Tests did not require any physician involvement whatsoever. Rather, the Insureds completed the pre-printed questionnaires, and a computer automatically generated a report that rated the Insureds' responses according to pre-set criteria.

132.    RMS misrepresented that licensed physicians had some role in the performance of the tests in order to support their charges under CPT code 99358, when in fact the charges for the

Outcome Assessment Tests were unreimburseable under CPT code 99358 because the tests were not performed by physicians.

### 5. The Fraudulent ROM/Muscle Tests

133.    In an attempt to maximize the fraudulent billing that they submit or cause to be submitted for each Insured, after purporting to provide initial examinations, the Defendants instructed most Insureds to return for one or more rounds of medically useless ROM/Muscle Tests.   The charges for the computerized ROM/Muscle Tests were fraudulent in that the computerized ROM tests were medically unnecessary and were performed pursuant to the Defendants' fraudulent treatment protocol.

134.    Like the Defendants' charges for the other Fraudulent Services they purported to provide, the charges for the ROM/Muscle Tests were fraudulent in that the ROM/Muscle Tests were medically unnecessary and were performed pursuant to the kickbacks that RMS paid.

### a. Traditional Tests to Evaluate the Human Body's Range of Motion and Muscle Strength

135.    The adult human body is made up of 206 bones joined together at various joints that either are of the fixed, hinged or ball-and-socket variety.  The body's hinged joints and ball-and-socket joints facilitate movement, allowing a person to – for example – bend a leg, rotate a shoulder, or move the neck to one side.

136.    The measurement of the capacity of a particular joint to perform its full and proper function represents the joint's "range of motion".  Stated in a more illustrative way, range of motion is the amount that a joint will move from a straight position to its bent or hinged position.

137.    A traditional, or manual, range of motion test consists of a non-electronic measurement of the joint's ability to move in comparison with an unimpaired or "ideal" joint.  In a traditional range of motion test, the physician asks the patient to move his or her joints at

31

various angles, or the physician moves the joints. The physician then evaluates the patient's range of motion either by sight or through the use of a manual inclinometer or a goniometer (i.e., a device used to measure angles).

138.    Similarly, a traditional muscle strength test consists of a non-electronic measurement of muscle strength, which is accomplished by having the patient move his/her body in a given direction against resistance applied by the physician.  For example, if a physician wanted to measure muscle strength in the muscles surrounding a patient's knee, he would apply resistance against the patient's leg while having him/her move the leg up, then apply resistance against the patient's leg while having him/her move the leg down.

139.    Physical examinations performed on patients with soft-tissue trauma – the alleged complaint advanced by virtually every Insured who treated with RMS – necessarily require range of motion and muscle strength tests, inasmuch as these tests provide a starting point for injury assessment and treatment planning.  Unless a physician knows the extent of a given patient's joint or muscle strength impairment, there is no way to properly diagnose or treat the patient's injuries.  Evaluation of range of motion and muscle strength is an essential component of the "hands-on" examination of a trauma patient.

140.    Since range of motion and muscle strength tests must be conducted as an element of a soft-tissue trauma patient's initial consultation, as well as during any follow-up examinations, the Fee Schedule provides that range of motion and muscle strength tests are to be reimbursed as an element of the initial consultations and follow-up examinations.

141.    In other words, healthcare providers cannot conduct and bill for an initial consultation or follow-up examination, then bill separately for contemporaneously-provided ROM/Muscle Tests.

### b. The ROM Defendants Duplicate Billing for Medically Unnecessary ROM/Muscle Tests

142.     To the extent that RMS actually provided initial examinations and follow-up examinations in the first instance, the ROM Defendants conducted manual range of motion and manual muscle tests on virtually every Insured during each initial and/or follow-up examination.

143.     The charges for these manual range of motion and manual muscle tests were part and parcel of the charges that RMS routinely submitted for the initial examinations under CPT codes 99244, and for the follow-up examinations under CPT code 99214.

144.     Despite the fact that every Insured already purportedly had undergone manual range of motion and muscle testing during their initial examinations and/or follow-up examinations, and despite the fact that reimbursement for range of motion and muscle testing already had been paid by GEICO as a component of reimbursement for the initial examinations and/or follow-up examinations, RMS systemically billed for, and purported to perform, a series of computerized ROM/Muscle Tests on most Insureds.

145.     Though the Insureds routinely visited the Clinics several times per month for follow-up examinations and other Fraudulent Services, RMS often deliberately scheduled separate appointments for computerized range of motion and muscle tests so that they could bill for those procedures separately, without having to include them in the billing for the follow-up examinations, as required by the Fee Schedule.

146.     RMS purported to provide the computerized range of motion tests by placing a digital inclinometer or goniometer on various parts of the Insureds' bodies (affixed by Velcro straps) while the Insured was asked to attempt various motions and movements.  The test was virtually identical to the manual range of motion testing that is described above and that purportedly was performed during each initial examination and follow-up examination, except

33

that a digital printout was obtained rather than the provider manually documenting the Insured's range of motion.

147.   RMS purported to have provided the computerized muscle strength tests by placing a strain gauge-type measurement apparatus against a stationary object, against which the patient pressed three-to-four separate times using various muscle groups. As with the computerized ROM tests, this computerized muscle strength test was virtually identical to the manual muscle strength testing that is described above and that purportedly was performed during the initial examinations and/or follow-up examinations – except that a digital printout was obtained.

148.   The information gained through the use of the computerized ROM tests and muscle tests was not significantly different from the information obtained through the manual testing that was part and parcel of virtually every Insured's initial examination and follow-up examinations.

149.   In the relatively minor soft-tissue injuries allegedly sustained by the Insureds – to the extent that any of the Insureds suffered any injuries at all as the result of the automobile accidents they purported to experience – the difference of a few percentage points in the Insured's range of motion reading or pounds of resistance in the Insured's muscle strength testing was meaningless. This is evidenced by the fact the results were never incorporated into the rehabilitation programs of any of the Insureds whom they purported to treat.

150.   The computerized ROM tests and muscle tests were part and parcel of the Defendants' interrelated fraudulent schemes, inasmuch as the "service" was rendered pursuant to a pre-established protocol that: (i) in no way aided in the assessment and treatment of the Insureds; and (ii) was designed solely to financially enrich the Defendants.

### c. The ROM Defendants' Fraudulent Unbundling of Charges for ROM/Muscle Tests

151.    Not only did RMS deliberately conduct duplicative, medically unnecessary ROM/Muscle Tests, they also unbundled the tests in order to maximize the fraudulent charges that they could submit, or cause to be submitted, to GEICO.

152.    Pursuant to the Fee Schedule, when computerized range of motion testing and muscle testing are performed on the same date, all of the testing should be reported and billed using CPT code 97750.

153.    CPT code 97750 is a "time-based" code that – in the New York metropolitan area – allows for a single charge of $45.71 for every 15 minutes of testing that is performed.

154.    Thus, if a provider performed 15 minutes of computerized range of motion and muscle testing, it would be permitted a single charge of $45.71 under CPT code 97750. If the provider performed 30 minutes of computerized range of motion and muscle testing, it would be permitted to submit two charges of $45.71 under CPT code 97750, resulting in total charges of $91.42. If the provider performed 45 minutes of computerized range of motion and muscle testing, it would be permitted to submit three charges of $45.71 under CPT code 97750, resulting in total charges of $137.13, and so forth.

155.    RMS virtually always purported to provide computerized range of motion and muscle tests to Insureds on the same dates of service.

156.    To the extent that RMS actually provided the ROM/Muscle Tests to Insureds in the first instance, the ROM/Muscle Tests – together – never took more than 15 minutes to perform.

157.    Thus, even if the ROM/Muscle Tests purported to be performed were medically necessary, and performed in the first instance, they would be limited to a single, time-based

charge of $45.71 under CPT code 97750 for each date of service on which they performed computerized range of motion and muscle tests on an Insured.

158.    In order to maximize their fraudulent billing for the ROM/Muscle Tests, the Defendants unbundled what should have been – at most – a single charge of $45.71 under CPT code 97750 for both computerized range of motion and muscle testing into: (i) multiple charges of $45.71 under CPT code 95831 (for the muscle tests); and multiple charges of $43.60 under CPT code 95851 (for the range of motion tests).

159.    By unbundling what should – at most – have been single $45.71 charges under CPT code 97750 into multiple charges under CPT codes 95831 and 95851, the Defendants generally submitted charges in excess of $300.00, and often submitted charges in excess of $600.00, for each round of computerized range of motion and muscle testing they purported to provide.

**6.  The Fraudulent Electrodiagnostic Testing**

160.    As part of their efforts to maximize the fraudulent billing that they submitted or caused to be submitted for each Insured, the Management Defendants, Dr. El Soury, Dr. Elhadidy, and RMS purported to subject most Insureds to a series of medically unnecessary electromyography ("EMG") tests and nerve conduction velocity ("NCV") tests (collectively the "electrodiagnostic" or "EDX" tests).

161.    Like the charges for the other Fraudulent Services, the charges for the EDX tests were fraudulent in that the EDX tests were medically unnecessary and were performed – to the extent that they were performed at all – pursuant to the Defendants' pre-determined fraudulent treatment protocol at RMS.

162.    In keeping with the fact that the EDX tests were medically unnecessary and were performed – to the extent that they were performed at all – pursuant to the Defendants' pre-

determined fraudulent treatment protocol, the results of the EDX tests almost never were incorporated into the Insureds' respective treatment plans.

### a.   The Human Nervous System and Electrodiagnostic Testing

163.   The human nervous system is composed of the brain, spinal cord, spinal nerve roots and peripheral nerves that extend throughout the body, including, the arms and legs and into the hands and feet. Two primary functions of the nervous system are to collect and relay sensory information through the nerve pathways into the spinal cord and up to the brain, and to transmit signals from the brain into the spinal cord and through the peripheral nerves to initiate muscle activity throughout the body.

164.   The nerves responsible for collecting and relaying sensory information to the brain are called sensory nerves, and the nerves responsible for transmitting signals from the brain to initiate muscle activity throughout the body are called motor nerves.  The Peripheral Nervous System consists of both sensory and motor nerves. They carry electrical impulses throughout the body, from the spinal cord and extending, for example, into the hand and feet through the arms and legs.

165.   The segments of nerves closest to the spine and through which impulses travel between the peripheral nerves and the spinal cord are called the nerve roots.  A "pinched" nerve root is called a radiculopathy and can cause various symptoms including pain, altered sensation, altered reflexes on examination, and loss of muscle control.

166.   EMG tests and NCV tests are forms of electrodiagnostic tests, and purportedly were provided by the Management Defendants, Dr. El Soury, Dr. Elhadidy and RMS because they were medically necessary to determine whether the Insureds had radiculopathies.

167.   The American Association of Neuromuscular Electrodiagnostic Medicine ("AANEM"), which consists of thousands of neurologists and physiatrists and is dedicated solely

to the scientific advancement of neuromuscular medicine, has adopted a recommended policy (the "Recommended Policy") regarding the optimal use of electrodiagnostic medicine in the diagnosis of various forms of neuropathies, including radiculopathies. The Recommended Policy accurately reflects the demonstrated utility of various forms of electrodiagnostic tests, and has been endorsed by two other premier professional medical organizations, the American Academy of Neurology and the American Academy of Physical Medicine and Rehabilitation. A copy of the Recommended Policy is annexed hereto as Exhibit "6."

168.    According to the Recommended Policy, both NCV tests and EMG tests normally are required for a clinical diagnosis of peripheral nervous system disorders, including radiculopathies. See Exhibit "6." As the Recommended Policy states:

> Radiculopathies cannot be diagnosed by NCS alone; needle EMG must be performed to confirm a radiculopathy. Therefore, these studies should be performed together by one physician supervising and/or performing all aspects of the study.
> …
> The EDX laboratory must have the ability to perform needle EMGs. NCSs should not be performed without needle EMGs except in unique circumstances." Id.

169.    According to the Recommended Policy, the maximum number of NCV tests necessary to diagnose a radiculopathy in 90 percent of all patients is: (i) NCV tests of three motor nerves; (ii) NCV tests of two sensory nerves; and (iii) two H-reflex studies. According to the Recommended Policy, the maximum number of EMG tests necessary to diagnose a radiculopathy in 90 percent of all patients is EMG tests of two limbs. See Exhibit "6."

**b.  The Fraudulent NCVs**

170.    NCV tests are non-invasive tests in which peripheral nerves in the arms and legs are stimulated with an electrical impulse to cause the nerve to depolarize. The depolarization, or "firing," of the nerve is transmitted, measured and recorded with electrodes attached to the surface of the skin. An EMG machine then documents the timing of the nerve response (the

38

"latency"), the magnitude of the response (the "amplitude"), and the speed at which the nerve conducts the impulse over a measured distance from one stimulus to another (the "conduction velocity"). In addition, the EMG machine displays the changes in amplitude over time as a "waveform." The amplitude, latency, velocity, and shape of the response then should be compared with well-defined normal values to identify the existence, nature, extent, and specific location of any abnormalities in the sensory and motor nerve fibers.

171.    There are several motor and sensory peripheral nerves in the arms and legs that can be tested with NCVs. Moreover, most of these peripheral nerves have both sensory and motor nerve fibers, either or both of which can be tested with NCVs.

172.    F-wave and H-reflex studies are additional types of NCV tests that may be conducted in addition to the sensory and motor nerve NCV studies. F-wave and H-reflex studies generally are used to derive the time required for an electrical impulse to travel from a stimulus site on a nerve in the peripheral part of a limb, up to the spinal cord, and then back again. The motor and sensory NCV studies are designed to evaluate nerve conduction in nerves within a limb.

173.    Though the Management Defendants, Dr. El Soury, Dr. Elhadidy and RMS purported to provide NCV tests to Insureds in order to determine whether the Insureds suffered from radiculopathies, virtually none of the Insureds actually presented with any symptoms of radiculopathy or any other serious medical problems arising from any automobile accidents.  In actuality, the Management Defendants, Dr. El Soury, Dr. Elhadidy and RMS provided NCV tests to Insureds – to the extent that they provided them at all – as part of the Defendants' pre-determined, fraudulent treatment protocol designed to maximize the billing that they could submit for each Insured.

174.     Further, in an attempt to extract the maximum billing out of each Insured who supposedly received NCV tests, the Management Defendants, Dr. El Soury, Dr. Elhadidy and RMS routinely purported to test far more nerves than recommended by the Recommended Policy. Specifically, to maximize the fraudulent charges that they could submit to GEICO and other insurers, the Management Defendants, Dr. El Soury, Dr. Elhadidy and RMS routinely purported to perform and provide: (i) NCV tests of 4-8 motor nerves; (ii) NCV tests of 4-10 sensory nerves; as well as (iii) two H-reflex studies.

175.     The decision of which peripheral nerves to test in each limb and whether to test the sensory fibers, motor fibers, or both sensory and motor fibers in any such peripheral nerve must be tailored to each patient's unique circumstances. In a legitimate clinical setting, this decision is determined based upon a history and physical examination of the individual patient, as well as the real-time results obtained as the NCV tests are performed on particular peripheral nerves and their sensory and/or motor fibers. As a result, the nature and number of the peripheral nerves and the type of nerve fibers tested with NCV tests should vary from patient-to-patient.

176.     RMS never tailored the NCVs that they performed to the unique circumstances of each individual Insured. Instead, they applied a fraudulent protocol and purported to perform NCVs on the same peripheral nerves and nerve fibers for virtually every insured. Specifically, RMS purported to test the following peripheral nerves and nerve fibers on almost every Insured: (i) left and right median motor nerves; (ii) left and right peroneal motor nerves; (iii) left and right tibial motor nerves; (iv) left and right ulnar motor nerves; (v) left and right median sensory nerves; (vi) left and right radial sensory nerves; (vii) left and right superficial peroneal sensory nerves; (viii) left and right sural sensory nerves; (ix) left and right median anti sensory nerves and (x) left and right ulnar sensory nerves.

177.    Both the billing patterns and cookie-cutter approach to the NCVs that the Management Defendants, Dr. El Soury, Dr. Elhadidy and RMS purported to provide to Insureds clearly was not based on medical necessity and was plainly used to inflate the billing to GEICO, and to maximize ill-gotten profits for the Defendants.

### c.    The Fraudulent EMGs

178.    EMG tests involve insertion of a needle into various muscles in the spinal area ("paraspinal muscles") and in the arms and/or legs to measure electrical activity in each such muscle. The sound and appearance of the electrical activity in each muscle are compared with well-defined norms to identify the existence, nature, extent, and specific location of any abnormalities in the nerve roots, peripheral nerves, and muscles.

179.    There are many different muscles in the arms and legs that can be tested using EMGs. The decision of how many limbs and which muscles to test in each limb should be tailored to each patient's unique circumstances. In a legitimate clinical setting, this decision is based upon a history and physical examination of each individual patient, as well as the real-time results obtained from the EMGs as they are performed on each specific muscle. As a result, the number of limbs as well as the nature and number of the muscles tested through EMGs should vary from patient-to-patient.

180.    The Management Defendants, Dr. El Soury, Dr. Elhadidy, and RMS did not tailor the EMG tests they purported to perform and/or provide to the unique circumstances of each patient. Instead, they routinely purported to test the same muscles in the same limbs over and over again, without regard for individual patient presentation.

181.    Furthermore, even if there had been any need for any of these EMGs, the nature and number of the EMGs that the Management Defendants, Dr. El Soury, Dr. Elhadidy, and RMS generally purported to perform and/or provide frequently grossly exceeded the maximum

number of such tests – i.e., EMGs of two limbs – that should be necessary in at least 90 percent of all patients with a suspected diagnosis of radiculopathy. In many cases, the Management Defendants, Dr. El Soury, Dr. Elhadidy, and RMS purported to perform and/or provide EMGs on four limbs, in contravention of the Recommended Policy, in order to maximize the fraudulent billing that they could submit or cause to be submitted to GEICO and other insurers.

182.    More specifically, if all other conditions of coverage are satisfied, the Fee Schedule permits lawfully licensed healthcare professionals in the metropolitan New York area to submit maximum EMG charges of: (i) $185.73 under CPT code 95860 if an EMG is performed on at least five muscles of one limb; (ii) $241.50 under CPT code 95861 if an EMG is performed on at least five muscles in each of two limbs; (iii) $314.34 under CPT code 95863 if an EMG is performed on at least five muscles in each of three limbs; and (iv) $408.64 under CPT code 95864 if an EMG is performed on at least five muscles in each of four limbs.

183.    Not only did RMS routinely purport to provide four-limb EMGs to Insureds, in many cases the Defendants unbundled their four-limb EMG charges into two separate two-limb EMG charges of $241.50 per Insured, rather than a single four-limb EMG charge of $408.64, in order to maximize their fraudulent EMG billing and conceal the fact that they were providing four-limb EMGs to Insureds in contravention of the Recommended Policy.

184.    In keeping with the fact that the EMGs were not medically necessary, Dr. Elhadidy never performed adequate examination of an insured's motor system during examinations. Absent a motor system examination, it could not be possible for Dr. Elhadidy or any individual performing EDX testing, based on the findings of an examination to know exactly what muscles and nerves to test.

185.    To further defraud GEICO, the Defendants virtually always created and submitted EMG reports by Dr. Elhadidy finding abnormalities in only the paraspinal muscles. It is physiologically impossible for this to occur in every single EMG test.

### d.  The Defendants' Fraudulent Radiculopathy Diagnoses

186.    Radiculopathies are relatively rare in motor vehicle accident victims, occurring in – at most – only 19 percent of accident victims according to a large-scale, peer-reviewed 2009 study conducted by Dr. Braddom, Michael H. Rivner, M.D., and Lawrence Spitz, M.D. and published in Muscle & Nerve, the official journal of the AANEM.

187.    Furthermore, the cohort of accident victims considered in the study by Drs. Braddom, Rivner, and Spitz had been referred to a tertiary EDX testing laboratory at a major university teaching hospital, and therefore represented a more severely injured group of patients than the Insureds whom the Defendants purportedly treated.

188.    As a result, the frequency of radiculopathy in all motor vehicle accident victims – not only those who have relatively serious injuries that require referral to a major hospital EDX laboratory – is likely to be significantly lower than 19 percent.

189.    Virtually none of the Insureds whom RMS, Dr. El Soury and Dr. Elhadidy purported to treat suffered any serious medical problems as the result of any automobile accident, much less any radiculopathies.

190.    Even so, RMS, Dr. El Soury and Dr. Elhadidy purported to diagnose radiculopathies in the majority of the Insureds to whom they purported to provide EDX testing, despite the findings on the exams not warranting such a diagnosis.

191.    Additionally, RMS, Dr. El Soury and Dr. Elhadidy routinely over-diagnosed Insureds with multi-level radiculopathies, which are even rarer in automobile accident victims

than single-level radiculopathies.  Likewise, the findings of specific-level radiculopathy, based on an isolated parapinal abnormality are not a proper diagnosis under the Recommended Policy.

192.    The Defendants purported to arrive at their pre-determined radiculopathy diagnoses in order to create the appearance of severe injuries and thereby provide a false justification for the laundry-list of medically unnecessary Fraudulent Services that they purported to provide.

### 7.  The Fraudulent Physical Therapy Services by RMS

193.    In addition to the other Fraudulent Services that the Defendants purported to provide, RMS purported to subject most Insureds to a series of medically unnecessary physical therapy treatments.

194.    In most cases, RMS purported to subject each Insured to multiple physical therapy treatments over a period of several weeks, generally resulting in hundreds of dollars of charges for each Insured.

195.    Like the charges for the other Fraudulent Services, RMS' charges for the physical therapy were fraudulent in that the physical therapy was medically unnecessary and was performed pursuant to the Defendants' pre-determined fraudulent treatment protocol and the kickbacks that the Defendants paid to the Clinics.

196.    RMS' charges for the physical therapy were predicated on the phony boilerplate "diagnoses" they provided to the Insureds following the initial and follow-up examinations, as well as the medically useless and fraudulent EDX Tests that they purported to perform and/or provide.

197.    But for these ersatz "diagnoses" and phony EDX Tests, the Defendants never would have been able to submit charges for the physical therapy in the first instance, because they would have no way to justify the performance of the physical therapy.

### 8.   The Fraudulent Charges for Trigger Point Injections

198.     In addition to the other Fraudulent Services they purported to provide, the Management Defendants, Dr. El Soury and RMS purported to subject many Insureds to a series of medically unnecessary trigger point injections.

199.     The Management Defendants, Dr. El Soury and RMS then billed the trigger point injections to GEICO as multiple charges under CPT code 20553, generally resulting in charges of at least $500.00, and often more than $1,000.00, for each round of trigger point injections that they purported to provide.

200.     Like the  charges for the other Fraudulent Services, the charges for the trigger point injections were fraudulent in that the trigger point injections were medically unnecessary and were performed pursuant to the fraudulent treatment protocol of the Defendants and not to treat or otherwise benefit the Insureds.

201.     The Management Defendants, Dr. El Soury and RMS typically did not wait until any Insured failed conservative therapies before purporting to provide trigger point injections, because conservative therapy is not sufficiently remunerative.

202.     Instead, the Management Defendants, Dr. El Soury and RMS frequently purported to provide trigger point injections to Insureds within the first month or two – and often within days – after the Insureds' automobile accidents, before the Insureds could have had pain symptoms that persisted for more than three months and before the Insureds could have failed or been intolerant of conservative therapies for at least one month.

203.     The Management Defendants, Dr. El Soury and RMS purported to subject Insureds to trigger point injections despite the fact that almost none of the Insureds suffered any continuing injuries as the result of the relatively minor automobile accidents they claimed to experience, much less any trigger points.

### 9. Defendants' Unlawful Manipulation of the Fee Schedule via Services Rendered by Outreach

204.    As part of the scheme, the Defendants agreed to use Outreach as a tool to render additional physical therapy services and seek reimbursement beyond that to which they are lawfully entitled.

205.    Specifically, RMS submitted thousands of charges seeking reimbursement for physical therapy services (i.e., physical therapy evaluations, massage therapy, hot/cold pack application and electric stimulation) rendered to GEICO Insureds.  In conjunction, Outreach also submitted hundreds of bills seeking reimbursement for aqua-med therapy services rendered to the patients treated by RMS on the very same day.  In fact, these patients received physical therapy services at RMS followed by aqua-med therapy services at Outreach by the very same individual.  In order to conceal the fraudulent scheme, each bill submitted by RMS indicated that Dr. El Soury rendered the services – not the physical therapist.

206.    The Physical Medicine section of the Fee Schedule establishes ground rules that healthcare providers and insurers are required to follow when determining the permissible charge or reimbursement for a specific service.

207.    As it relates to physical therapy services and the scope of services relevant to the present dispute, Ground Rule 11 states:

> When multiple physical medicine procedures and/or modalities are performed on the same day, reimbursement is limited to 8.0 units or the amount billed, whichever is less.   The following codes represent the physical medicine procedures and modalities subject to this rule:

| | | | | | |
|---|---|---|---|---|---|
| 97010 | 97012 | 97014 | 97016 | 97018 | 97022 |
| 97024 | 97026 | 97028 | 97032 | 97033 | 97034 |
| 97035 | 97036 | 97039 | 97110 | 97112 | 97113 |
| 97116 | 97124 | 97139 | 97140 | 97150 | 97530 |
| 97535 | 97537 | 97542 | 97760 | 97761 | 97762 |

208.   Pursuant to the Fee Schedule, the majority of the above referenced CPT codes and corresponding physical procedures are assigned a relative value unit.   Therefore, a healthcare provider that provides physical therapy to an Insured cannot bill for and receive payment for any combination of the above referenced physical therapy procedures performed on the same patient on the same day if the aggregate relative value of all of those procedures exceeds 8.0 units.

209.   While aqua-med therapy purports to be a form of physical therapy (specifically hydrotherapy) that allegedly stimulates circulation, increases flexibility and range of motion and is foremost referred to patients who are experiencing chronic pain (pain that lasts longer than six months), the American Medical Association does not recognize it as an actual medical procedure – as a result, there is no recognized CPT Code for the performance of aqua-med therapy.   That is not surprising since aqua-med therapy, in the form that it is employed by Outreach, is no different than the type of services which are found at the local mall or shopping center and generally cost in the range of $5.00 to $10.00 a session.

210.   RMS conducted physical therapy evaluations and performed basic physical therapy services most often using Treatment Codes 97010 (hot/cold packs), 97014 (electrical stimulation) and 97124 (massage therapy), which have a cumulative relative value of 7.65. Nevertheless, patients who received the physical therapy from RMS then received aqua-med therapy from Outreach that was rendered to the patients that very same day.

211.   The billing provided and documentation submitted by Outreach represented that the aqua-med therapy - rendered by the same therapist who rendered physical therapy on behalf of RMS – was billed under CPT Codes : (i) 97039 – a "By Report" procedure having no relative value; and (ii) 97139 – an "unlisted *therapeutic* procedure" having a relative value of 2.89.

212.    The Fee Schedule sets forth monetary conversion factors that are based on the geographic location/region (by zip code) where a specific service was rendered and the type of service rendered.

213.    Outreach billed for services rendered out of the 24th Avenue location which falls within "Region IV" and, any physical medicine service (i.e., physical therapy) that is rendered in this region is subject to a conversion factor of $7.70.

214.    In each instance in which Outreach submitted charges for the aqua-jet procedure using Code 97139, the relative value of the procedure would have been 2.89 and, therefore, Outreach is only entitled to $22.25 (2.89 x $7.70) per procedure as opposed to $61.60 per procedure as billed by Outreach.

215.    In each instance in which Outreach submitted charges for the aqua-med procedure using Code 97039, there was no relative value and, therefore, reimbursement would be limited to the value of the service performed which is determined by the nature, extent and the need for the procedure or service, the time, the skill and the equipment necessary to perform the procedure. That information was never provided by Outreach because, at all times, Outreach knew that the procedure was nothing more than an extension of basic physical therapy.

216.    Although the bills were submitted to GEICO at or around the same time, the Defendants always sent them to GEICO under separate cover rather than in the same submission so as to conceal the fraudulent billing scheme.   Outreach and RMS engineered this claim submission process with the knowledge that the bills were distributed to different GEICO claim representatives and subsequently paid before the assigned GEICO representatives can conclude that the respective insured already received the maximum amount of treatment as per the Fee Schedule.

217.    Despite rendering just another mode of physical therapy, Outreach knowingly submitted charges to GEICO using a code that represents an unlisted therapy procedure so as to create an avenue by which it could bill GEICO exorbitant fees to which it was not entitled.  In an attempt to collect the balance of the fees, Outreach has engaged no-fault collection lawyers to file hundreds of lawsuits seeking to recover the balance of its inflated charges and the amounts paid by GEICO despite no entitlement to payment.

### D.  The Fraudulent Billing for Services Provided by Independent Contractors

218.    The Defendants' fraudulent scheme also included submission of claims to GEICO seeking payment for services performed by independent contractors. Under the No-Fault Laws, professional corporations are ineligible to bill for or receive payment for goods or services provided by independent contractors – the healthcare services must be provided by the professional corporations, themselves, or by their employees.

219.    Since 2001, the New York State Insurance Department consistently has reaffirmed its longstanding position that professional corporations are not entitled to receive reimbursement under the No-Fault Laws for healthcare providers performing services as independent contractors. See DOI Opinion Letter, February 21, 2001 ("where the health services are performed by a provider who is an independent contractor with the PC and is not an employee under the direct supervision of a PC owner, the PC is not authorized to bill under No-Fault as a licensed provider of those services"); DOI Opinion Letter, February 5, 2002 (refusing to modify position set forth in 2-21-01 Opinion letter despite a request from the New York State Medical Society); DOI Opinion Letter, March 11, 2002 ("If the physician has contracted with the PC as an independent contractor, and is not an employee or shareholder of the PC, such physician may not represent himself or herself as an employee of the PC eligible to bill for health services rendered on behalf of the PC, under the New York Comprehensive Motor Vehicle Insurance Reparations Act…"); DOI Opinion

Letter, October 29, 2003 (extending the independent contractor rule to hospitals); See DOI Opinion Letter, March 21, 2005 (DOI refused to modify its earlier opinions based upon interpretations of the Medicare statute issued by the CMS) (copies of the relevant DOI Opinion letters are annexed hereto as Exhibit "7").

220.     To the extent that any of the Fraudulent Services billed to GEICO through the PC Defendants were performed they were performed by independent contractors, rather than by employees.

221.     Dr. El Soury has never been the true owner or operator of RMS and has never practiced medicine through the professional corporation.

222.     Shahen has never been the true owner or operator of Outreach and has never practiced physical therapy through Outreach.

223.     Rather, the Management Defendants used a revolving door of physicians, including Dr. Elhadidy, physical therapists, and unlicensed technicians they controlled, who provided services on behalf of the PC Defendants.

224.     Here, the Management Defendants treated these physicians, physical therapists, and unlicensed technicians who performed the Fraudulent Services for the PC Defendants, as independent contractors, rather than as employees of the PC Defendants.

225.     For instance, the Defendants:

> (i)      paid the physicians, physical therapists and unlicensed technicians, either in whole or in part, on a 1099 basis rather than a W-2 basis;
>
> (ii)     established an understanding with the physicians, physical therapists and unlicensed technicians that they were independent contractors, rather than employees;
>
> (iii)    paid no employee benefits to the physicians, physical therapists and unlicensed technicians;
>
> (iv)    failed to secure and maintain W-4 or I-9 forms for the physicians, physical therapists and unlicensed technicians;

(v)    failed to withhold federal, state or city taxes on behalf of the physicians, physical therapists and unlicensed technicians;

(vi)   compelled the physicians, physical therapists and unlicensed technicians to pay for their own malpractice insurance at their own expense;

(vii)  permitted the physicians, physical therapists and unlicensed technicians to set their own schedules and days on which they desired to perform services;

(viii) permitted the physicians, physical therapists and unlicensed technicians to maintain non-exclusive relationships and perform services for their own practices and/or on behalf of other medical practices;

(ix)   failed to cover the physicians, physical therapists and unlicensed technicians for either unemployment or workers' compensation benefits; and

(x)    filed corporate and payroll tax returns (e.g. Internal Revenue Service ("IRS") forms 1120 and 941) that represented to the IRS and to the New York State Department of Taxation that the physicians, physical therapists and unlicensed technicians were independent contractors.

226.   By electing to treat the physicians, physical therapists and unlicensed technicians as independent contractors, the Defendants realized significant economic benefits – for instance:

(i)    avoiding the obligation to collect and remit income tax as required by 26 U.S.C. § 3102;

(ii)   avoiding payment of the FUTA excise tax required by 26 U.S.C. § 3301 (6.2 percent of all income paid);

(iii)  avoiding payment of the FICA excise tax required by 26 U.S.C. § 3111 (7.65 percent of all income paid);

(iv)   avoiding payment of workers' compensation insurance as required by New York Workers' Compensation Law § 10;

(v)    avoiding the need to secure any malpractice insurance; and

(vi)   avoiding claims of agency-based liability arising from work performed by the Treating Defendants and unlicensed technicians.

227.   Because the physicians, physical therapists and unlicensed technicians were independent contractors and performed the Fraudulent Services, the PC Defendants never had any right to bill for or collect No-Fault Benefits in connection with those services.

228.    The Defendants billed for the Fraudulent Services as if they were provided by actual employees of the PC Defendants to make it appear as if the services were eligible for reimbursement. The Defendants' misrepresentations were consciously designed to mislead GEICO into believing that it was obligated to pay for these services, when in fact GEICO was not.

## V.    The Fraudulent Billing the Defendants Submitted or Caused to be Submitted to GEICO

229.    To support their fraudulent charges, the Defendants systematically submitted or caused to be submitted hundreds of NF-3 forms and/or treatment reports through the PC Defendants to GEICO seeking payment for the Fraudulent Services for which the Defendants were not entitled to receive payment.

230.    The NF-3 forms and treatment reports that the Defendants submitted or caused to be submitted to GEICO were false and misleading in the following material respects:

(i)     The NF-3 forms and treatment reports uniformly misrepresented to GEICO that the Fraudulent Services were medically necessary. In fact, the Fraudulent Services were not medically necessary, in many cases were not actually performed, and were performed pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them.

(ii)    The NF-3 forms and treatment reports uniformly misrepresented and exaggerated the level of the Fraudulent Services and the nature of the Fraudulent Services that purportedly were provided.

(iii)   The NF-3 forms and treatment reports uniformly misrepresented to GEICO that Outreach was lawfully licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12). In fact, Outreach was not properly licensed in that it is a professional corporation that was unlawfully incorporated, unlawfully owned and controlled by unlicensed non-physicians, and nominally owned on paper by an individual who did not actually practice through the professional corporation.

(iv)    The NF-3 forms and treatment reports uniformly misrepresented to GEICO that the PC Defendants were in compliance with all material licensing laws and, therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12). In fact, the PC Defendants were not in compliance with all

material licensing laws in that it paid kickbacks for patient referrals and engaged in unlawful fee-splitting with unlicensed non-physicians.

(v)    The NF-3 forms submitted by Outreach uniformly misrepresented to GEICO the nature of the services rendered so as to bill and collect fees from GEICO and other New York automobile insurers over and above the maximum permissible charges for physical therapy allowable under the New York State Workers' Compensation Fee Schedule.

(vi)    The NF-3 forms and treatment reports uniformly misrepresented to GEICO that the PC Defendants were eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.11 for the Fraudulent Services. In fact, the PC Defendants were not eligible to seek or pursue collection of No-Fault Benefits for the Fraudulent Services because the Fraudulent Services were not provided by the PC Defendants' employees.

## VI.    The Defendants' Fraudulent Concealment and GEICO's Justifiable Reliance

231.    The Defendants legally and ethically were obligated to act honestly and with integrity in connection with the billing that they submitted, or caused to be submitted, to GEICO.

232.    To induce GEICO to promptly pay the fraudulent charges for the Fraudulent Services, the Defendants systemically concealed their fraud and went to great lengths to accomplish this concealment.

233.    Specifically, they knowingly misrepresented and concealed facts related to the PC Defendants in an effort to prevent discovery that the PC Defendants were unlawfully incorporated, unlawfully split fees with unlicensed persons, Outreach was owned on paper by individual who did not practice through the professional corporations and unlawfully paid kickbacks for patient referrals.

234.    Additionally, the Defendants entered into complex financial arrangements with one another that were designed to, and did, conceal the fact that the PC Defendants were unlawfully incorporated, unlawfully split fees with unlicensed persons, and/or unlawfully paid kickbacks for patient referrals.

235.    Furthermore, the Defendants knowingly misrepresented and concealed facts in order to prevent GEICO from discovering that the Fraudulent Services were medically unnecessary and performed pursuant to a fraudulent pre-determined protocol designed to maximize the charges that could be submitted.

236.    In addition, the Defendants knowingly misrepresented and concealed facts related to the employment status of the treating practitioners and technicians associated with PC Defendants in order to prevent GEICO from discovering they were not employed by the PC Defendants.

237.    Once GEICO began to suspect that the Defendants were engaged in fraudulent billing and treatment activities, GEICO requested that they submit additional verification including, but not limited to, examinations under oath to determine whether the charges submitted through the Defendants were legitimate. Nevertheless, in an attempt to conceal their fraud, the Defendants systematically failed and/or refused to respond to repeated requests for verification of the charges submitted.

238.    Outreach knowingly billed GEICO using an unlisted procedure code seeking payment for aqua-med services when, at all relevant times, it should have billed GEICO using established physical therapy procedure codes, if they were legitimately entitled to payment, which they were not.

239.    Furthermore, the Defendants knowingly have misrepresented and concealed facts in order to prevent GEICO from discovering that the healthcare services were performed pursuant to a fraudulent pre-determined protocol designed to avoid detection and the application of the Fee Schedule and maximize the charges that could be submitted.

240.    GEICO maintains standard office practices and procedures that are designed to and do ensure that no-fault claim denial forms or requests for additional verification of no-fault

claims are properly addressed and mailed in a timely manner in accordance with the No-Fault Laws.

241. In accordance with the No-Fault Laws, and GEICO's standard office practices and procedures, GEICO either: (i) timely and appropriately denied the pending claims for No-Fault Benefits submitted through the Defendants; or (ii) timely issued requests for additional verification with respect to all of the pending claims for No-Fault Benefits submitted through the defendants (yet GEICO failed to obtain compliance with the requests for additional verification), and, therefore, GEICO's time to pay or deny the claims has not yet expired.

242. The Defendants hired law firms to pursue collection of the fraudulent charges from GEICO and other insurers. These law firms routinely filed expensive and time-consuming litigation against GEICO and other insurers if the charges were not promptly paid in full.

243. GEICO is under statutory and contractual obligations to promptly and fairly process claims within 30 days. The facially-valid documents submitted to GEICO in support of the fraudulent charges at issue, combined with the material misrepresentations and fraudulent litigation activity described above, were designed to and did cause GEICO to rely upon them. As a result, GEICO incurred damages of more than $1,000,000.00 based upon the fraudulent charges.

244. Based upon the Defendants' material misrepresentations and other affirmative acts to conceal their fraud from GEICO, GEICO did not discover and could not reasonably have discovered that its damages were attributable to fraud until shortly before it filed this Complaint.

### FIRST CAUSE OF ACTION
**Against the PC Defendants**
**(Declaratory Judgment – 28 U.S.C. §§ 2201 and 2202)**

245. GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 244 above.

246. There is an actual case in controversy between GEICO and the PC Defendants regarding approximately $740,000.00 in fraudulent billing for services that have been submitted to GEICO.

247. The PC Defendants have no right to receive payment for any pending bills submitted to GEICO because the Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them.

248. The PC Defendants have no right to receive payment for any pending bills submitted to GEICO because the billing codes used for the Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

249. The PC Defendants have no right to receive payment for any pending bills submitted to GEICO because the Fraudulent Services were provided pursuant to illegal kickback arrangements between the Management Defendants, referring providers and other unlicensed laypersons.

250. The PC Defendants have no right to receive payment for any pending bills submitted to GEICO because the Fraudulent Services were provided by independent contractors, rather than by the PC Defendants' employees.

251. The PC Defendants have no right to receive payment for any pending bills submitted to GEICO because they are unlawfully incorporated, owned, and controlled by the Management Defendants, who are not licensed physicians, and, therefore, were ineligible to bill for or to collect no-fault benefits.

252.    Outreach has no right to receive payment for any pending bills submitted to GEICO because it was nominally owned on paper by an individual who did not actually practice physical therapy through the professional corporation.

253.    Outreach has no right to receive reimbursement because it was established for the purposes of deceiving GEICO into paying Outreach monies to which it was not entitled through the establishment of financial relationships designed to allow Outreach and RMS to bill above and beyond the maximum amount of physical therapy allowable as per the New York State Workers' Compensation Fee Schedule.

254.    The PC Defendants have no right to receive payment for any pending bills submitted to GEICO because they unlawfully split fees with unlicensed individuals and entities and, therefore, were ineligible to bill for or to collect no-fault benefits.

255.    Accordingly, GEICO requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that the PC Defendants have no right to receive payment for any pending bills submitted to GEICO because:

(i)     the Fraudulent Services were not medically necessary and were provided pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them;

(ii)    the billing codes used for the Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO;

(iii)   the Fraudulent Services were provided pursuant to illegal kickback arrangements between the Defendants and others;

(iv)    the Fraudulent Services were provided by independent contractors, rather than by the PC Defendants' employees;

(v)     the PC Defendants were unlawfully incorporated, owned, and controlled by unlicensed individuals and entities and, therefore, were ineligible to bill for or to collect no-fault benefits;

(vi)     Outreach is nominally owned on paper by an individual who did not actually practice physical therapy through the professional corporation;

(vii)    the services rendered by Outreach are physical therapy services that are subject to the limitations set forth in the Fee Schedule and, therefore, Outreach is not entitled to reimbursement for services rendered to GEICO insureds that have already received the maximum allowable units of physical therapy; and

(viii)   the PC Defendants unlawfully split fees with unlicensed individuals and entities and, therefore, were ineligible to bill for or to collect no-fault benefits.

## SECOND CAUSE OF ACTION
### Against Dr. El Soury, Dr Elhadidy and the Management Defendants
### (Violation of RICO, 18 U.S.C. § 1962(c))

256.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 255 above.

257.    RMS is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engaged in activities which affected interstate commerce.

258.    Dr. El Soury, Dr Elhadidy, Zemlyansky, Danilovich, Barukin, Zayonts, Kremerman, Zaretskiy, and John Doe Defendants 1 – 10 knowingly have conducted and/or participated, directly or indirectly, in the conduct of RMS' affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent bills on a continuous basis for over five years seeking payments that RMS was not eligible to receive under the No-Fault Laws because: (i) it was unlawfully incorporated and owned and controlled by non-physicians; (ii) it engaged in fee-splitting with non-physicians; (iii) the billed-for services were not medically necessary and were performed pursuant to a pre-determined, fraudulent protocol designed solely to enrich the Defendants; (iv) the billed-for services were performed pursuant to kickbacks; (v) the billed-for services were performed by independent contractors, rather than by RMS employees; and (vi) the billing codes used for the services

misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "1."

259.    RMS' business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Dr. El Soury, Dr Elhadidy Zemlyansky, Danilovich, Barukin, Zayonts, Kremerman, Zaretskiy, and John Doe Defendants 1 – 10 operated RMS, insofar as RMS never was eligible to bill for or collect No-Fault Benefits, and acts of mail fraud therefore were essential in order for RMS to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that the Defendants continue to attempt collection on the fraudulent billing submitted through RMS to the present day.

260.    RMS was engaged in inherently unlawful acts, inasmuch as its very corporate existence was an unlawful act, considering that it was unlawfully incorporated, owned and controlled by non-physicians and unlawfully paid for patient referrals, and its existence therefore depended on continuing misrepresentations made to the New York State Department of Education and the New York State Department of State. These inherently unlawful acts were taken by RMS in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

261.    GEICO was injured in its business and property by reason of the above-described conduct in that it paid at least $1,000,000.00 pursuant to the fraudulent bills that the Defendants submitted or caused to be submitted through RMS.

262.     By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

### THIRD CAUSE OF ACTION
**Against Dr. El Soury, Dr Elhadidy and the Management Defendants**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

263.     GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 262 above.

264.     RMS is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engaged in activities which affected interstate commerce.

265.     Dr. El Soury, Dr Elhadidy Zemlyansky, Danilovich, Barukin, Zayonts, Kremerman, Zaretskiy, and John Doe Defendants 1 – 10 were employed by and/or associated with the RMS enterprise.

266.     Dr. El Soury, Dr Elhadidy Zemlyansky, Danilovich, Barukin, Zayonts, Kremerman, Zaretskiy, and John Doe Defendants 1 – 10 knowingly agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of RMS' affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent bills on a continuous basis for over five years seeking payments that RMS was not eligible to receive under the No-Fault Laws because: (i) it was unlawfully incorporated and owned and controlled by non-physicians; (ii) it engaged in fee-splitting with non-physicians; (iii) the billed-for services were not medically necessary and were performed pursuant to a pre-determined, fraudulent protocol designed solely to enrich the Defendants; (iv) the billed-for services were performed pursuant to kickbacks; (v) the billed-for services were performed by independent contractors, rather than by RMS employees; and (vi) the billing codes

used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "1." Each such mailing was made in furtherance of the mail fraud scheme.

267.    Dr. El Soury, Dr Elhadidy Zemlyansky, Danilovich, Barukin, Zayonts, Kremerman, Zaretskiy, and John Doe Defendants 1 – 10 knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

268.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $1,000,000.00 pursuant to the fraudulent bills that the Defendants submitted or caused to be submitted through RMS.

269.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

## FOURTH CAUSE OF ACTION
### Against RMS, Dr. El Soury, Dr Elhadidy and the Management Defendants
### (Common Law Fraud)

270.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 269 above.

271.    RMS, Dr. El Soury, Dr. Elhadidy, Zemlyansky, Danilovich, Barukin, Zayonts, Kremerman, Zaretskiy, and John Doe Defendants 1 – 10, intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO

in the course of their submission of hundreds of fraudulent bills seeking payment for the Fraudulent Services.

272.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that RMS were properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 NYCRR § 65-3.16(a)(12), when in fact it was unlawfully incorporated and actually owned and controlled by non-physicians; (ii) in every claim, the representation that RMS was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 NYCRR § 65-3.16(a)(12), when in fact the professional corporation was not properly licensed in that they paid kickbacks for patient referrals and engaged in illegal fee-splitting with non-physicians; (iii) in every claim, the representation that the billed-for services were medically necessary, when in fact the billed-for services were not medically necessary and were performed pursuant to a pre-determined, fraudulent protocol designed solely to enrich the Defendants; (iv) in every claim, the representation that the billed-for services were performed by the PC Defendants' employees, when in fact the billed-for services were performed by independent contractors; and (v) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted.

273.    RMS, Dr. El Soury, Dr. Elhadidy, Zemlyansky, Danilovich, Barukin, Zayonts, Kremerman, Zaretskiy, and John Doe Defendants 1 – 10 intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through RMS that were not compensable under the No-Fault Laws.

274.   GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $1,000,000.00 pursuant to the fraudulent bills that RMS, Dr. El Soury, Dr. Elhadidy, Zemlyansky, Danilovich, Barukin, Zayonts, Kremerman, Zaretskiy, and John Doe Defendants 1 – 10 submitted or caused to be submitted through RMS.

275.   RMS, Dr. El Soury, Dr. Elhadidy, Zemlyansky, Danilovich, Barukin, Zayonts, Kremerman, Zaretskiy, and John Doe Defendants 1 – 10's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

276.   Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## FIFTH CAUSE OF ACTION
### Against RMS, Dr. El Soury, Dr. Elhadidy and the Management Defendants
### (Unjust Enrichment)

277.   GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 276 above.

278.   As set forth above, RMS, Dr. El Soury, Dr. Elhadidy, Zemlyansky, Danilovich, Barukin, Zayonts, Kremerman, Zaretskiy, and John Doe Defendants 1 – 10 have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

279.   When GEICO paid the bills and charges submitted by or on behalf of RMS for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on RMS, Dr. El Soury, Dr. Elhadidy, Zemlyansky, Danilovich, Barukin, Zayonts, Kremerman, Zaretskiy, and John Doe Defendants 1 – 10's improper, unlawful, and/or unjust acts.

280.   RMS, Dr. El Soury, Dr. Elhadidy, Zemlyansky, Danilovich, Barukin, Zayonts, Kremerman, Zaretskiy, and John Doe Defendants 1 – 10 have been enriched at GEICO's expense

by GEICO's payments, which constituted a benefit that RMS, Dr. El Soury, Zemlyansky, Danilovich, Barukin, Zayonts, Kremerman, Zaretskiy, and John Doe Defendants 1 – 10 voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

281.    RMS, Dr. El Soury, Dr. Elhadidy, Zemlyansky, Danilovich, Barukin, Zayonts, Kremerman, Zaretskiy, and John Doe Defendants 1 – 10's retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

282.    By reason of the above, RMS, Dr. El Soury, Dr. Elhadidy, Zemlyansky, Danilovich, Barukin, Zayonts, Kremerman, Zaretskiy, and John Doe Defendants 1 – 10 have been unjustly enriched in an amount to be determined at trial, but in no event less than $1,000,000.00.

### SIXTH CAUSE OF ACTION
#### Against Shahen and the Management Defendants
#### (Violation of RICO, 18 U.S.C. § 1962(c))

283.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 281 above.

284.    Outreach is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engaged in activities which affected interstate commerce.

285.    Shahen, Zemlyansky, Danilovich, Barukin, Zayonts, Kremerman, Zaretskiy, and John Doe Defendants 1 – 10 knowingly have conducted and/or participated, directly or indirectly, in the conduct of Outreach's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent bills on a continuous basis for over four years seeking payments that Outreach was not eligible to receive under the No-Fault Laws because: (i) it was unlawfully incorporated and owned and controlled by non-physical therapists; (ii) it nominally was owned on paper by a physical therapist who did not practice

physical therapy through the professional corporation; (iii) it engaged in fee-splitting with non-physical therapists; (iv) the billed-for services were not medically necessary and were performed pursuant to a pre-determined, fraudulent protocol designed solely to enrich the Defendants; (v) the billed-for services were performed pursuant to kickbacks; (vi) the billed-for services were performed by independent contractors, rather than by Outreach employees; (vii) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "2."

286.    Outreach's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Dr. El Soury, Zemlyansky, Danilovich, Barukin, Zayonts, Kremerman, Zaretskiy, and John Doe Defendants 1 – 10 operated Outreach, insofar as Outreach never was eligible to bill for or collect No-Fault Benefits, and acts of mail fraud therefore were essential in order for Outreach to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that the Defendants continue to attempt collection on the fraudulent billing submitted through Outreach to the present day.

287.    Outreach was engaged in inherently unlawful acts, inasmuch as its very corporate existence was an unlawful act, considering that it was unlawfully incorporated, owned and controlled by non-physicians while designating a physical therapist who did not practice through the professional corporation as the nominal owner, and unlawfully paid for patient referrals, and its existence therefore depended on continuing misrepresentations made to the New York State

65

Department of Education and the New York State Department of State. These inherently unlawful acts were taken by Outreach in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

288.    GEICO was injured in its business and property by reason of the above-described conduct in that it paid at least $15,000.00 pursuant to the fraudulent bills that the Defendants submitted or caused to be submitted through Outreach.

289.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

### SEVENTH CAUSE OF ACTION
**Against Shahen and the Management Defendants**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

290.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 289 above.

291.    Outreach is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engaged in activities which affected interstate commerce.

292.    Shahen, Zemlyansky, Danilovich, Barukin, Zayonts, Kremerman, Zaretskiy, and John Doe Defendants 1 – 10 were employed by and/or associated with the Outreach enterprise.

293.    Shahen, Zemlyansky, Danilovich, Barukin, Zayonts, Kremerman, Zaretskiy, and John Doe Defendants 1 – 10 knowingly agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of Outreach's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent bills on a continuous basis for over four years seeking payments that Outreach was not eligible to receive under the No-Fault Laws because: (i) it was unlawfully incorporated and owned

and controlled by non- therapists; (ii) it nominally was owned on paper by a physical therapist who did not practice physical therapy through the professional corporation; (iii) it engaged in fee-splitting with non-physicians; (iv) the billed-for services were not medically necessary and were performed pursuant to a pre-determined, fraudulent protocol designed solely to enrich the Defendants; (v) the billed-for services were performed pursuant to kickbacks; (vi) the billed-for services were performed by independent contractors, rather than by Outreach employees; and (vii) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "2." Each such mailing was made in furtherance of the mail fraud scheme.

294.    Shahen, Zemlyansky, Danilovich, Barukin, Zayonts, Kremerman, Zaretskiy, and John Doe Defendants 1 – 10 knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

295.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $15,000.00 pursuant to the fraudulent bills that the Defendants submitted or caused to be submitted through Outreach.

296.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

**EIGHTH CAUSE OF ACTION**
**Against Outreach, Shahen and the Management Defendants**
**(Common Law Fraud)**

297.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 296 above.

298.    Outreach, Shahen, Zemlyansky, Danilovich, Barukin, Zayonts, Kremerman, Zaretskiy, and John Doe Defendants 1 – 10, intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of thousands of fraudulent bills seeking payment for the Fraudulent Services.

299.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that Shahen were properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 NYCRR § 65-3.16(a)(12), when in fact it was unlawfully incorporated and actually owned and controlled by non- physical therapists; (ii) in every claim, the representation that Shahen was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 NYCRR § 65-3.16(a)(12), when in fact the professional corporation was not properly licensed in that they paid kickbacks for patient referrals, engaged in illegal fee-splitting with non- physical therapists, and were owned on paper by a physical therapist who did not practice physical therapy through the professional corporation; (iii) in every claim, the representation that the billed-for services were medically necessary, when in fact the billed-for services were not medically necessary and were performed pursuant to a pre-determined, fraudulent protocol designed solely to enrich the Defendants; (iv) in every claim, the representation that the billed-for services were performed by Outreach's employees, when in fact the billed-for services were performed by independent contractors; and (v) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted.

300.    Outreach, Shahen, Zemlyansky, Danilovich, Barukin, Zayonts, Kremerman, Zaretskiy, and John Doe Defendants 1 – 10 intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Outreach that were not compensable under the No-Fault Laws.

301.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $15,000.00 pursuant to the fraudulent bills that Outreach, Shahen, Zemlyansky, Danilovich, Barukin, Zayonts, Kremerman, Zaretskiy, and John Doe Defendants 1 – 10 submitted or caused to be submitted through Outreach.

302.    Outreach, Shahen, Zemlyansky, Danilovich, Barukin, Zayonts, Kremerman, Zaretskiy, and John Doe Defendants 1 – 10's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

303.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

### NINTH CAUSE OF ACTION
**Against Outreach, Shahen and the Management Defendants**
**(Unjust Enrichment)**

304.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 303 above.

305.    As set forth above, Outreach, Shahen, Zemlyansky, Danilovich, Barukin, Zayonts, Kremerman, Zaretskiy, and John Doe Defendants 1 – 10 have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

306.    When GEICO paid the bills and charges submitted by or on behalf of Outreach for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments

based on Outreach, Shahen, Zemlyansky, Danilovich, Barukin, Zayonts, Kremerman, Zaretskiy, and John Doe Defendants 1 – 10's improper, unlawful, and/or unjust acts.

307.    Outreach, Shahen, Zemlyansky, Danilovich, Barukin, Zayonts, Kremerman, Zaretskiy, and John Doe Defendants 1 – 10 have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that Outreach, Shahen, Zemlyansky, Danilovich, Barukin, Zayonts, Kremerman, Zaretskiy, and John Doe Defendants 1 – 10 voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

308.    Outreach, Shahen, Zemlyansky, Danilovich, Barukin, Zayonts, Kremerman, Zaretskiy, and John Doe Defendants 1 – 10's retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

309.    By reason of the above, Outreach, Shahen, Zemlyansky, Danilovich, Barukin, Zayonts, Kremerman, Zaretskiy, and John Doe Defendants 1 – 10 have been unjustly enriched in an amount to be determined at trial, but in no event less than $15,000.00.

### TENTH CAUSE OF ACTION
**Against Dr. Elhadidy**
**(Aiding and Abetting Fraud)**

310.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 309 above.

311.    Dr. Elhadidy knowingly aided and abetted the fraudulent scheme that was perpetrated on GEICO by Dr. El Soury, Dr. Elhadidy, Zemlyansky, Danilovich, Barukin, Zayonts, Kremerman, Zaretskiy, and John Doe Defendants 1 – 10.

312.    The acts of Dr. Elhadidy in furtherance of the fraudulent scheme include knowingly purporting to perform the Fraudulent Services and permitting their names to be used in the billing and treatment reports for the Fraudulent Services despite his knowledge that PC Defendants were ineligible to bill for or to collect No-Fault Benefits in connection with the

Fraudulent Services because: (i) in every claim, the representation that RMS was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 NYCRR § 65-3.16(a)(12), when in fact it was unlawfully incorporated and actually owned and controlled by non-physicians; (ii) in every claim, the representation that RMS was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 NYCRR § 65-3.16(a)(12), when in fact the professional corporation was not properly licensed in that it paid kickbacks for patient referrals, engaged in illegal fee-splitting with non-physicians, and was owned on paper by a physician who did not practice medicine through the professional corporation; (iii) in every claim, the representation that the billed-for services were medically necessary, when in fact the billed-for services were not medically necessary and were performed pursuant to a pre-determined, fraudulent protocol designed solely to enrich the Defendants; (iv) in every claim, the representation that the billed-for services were performed by the PC Defendants' employees, when in fact the billed-for services were performed – to the extent that they were performed at all – by independent contractors.

313.   The conduct of Dr. Elhadidy in furtherance of the fraudulent scheme was significant and material. The conduct of Dr. Elhadidy was a necessary part of and was critical to the success of the fraudulent scheme because without his actions, including purporting to perform the Fraudulent Services, there would be no opportunity for RMS to obtain payment from GEICO and from other insurers.

314.   Dr. Elhadidy aided and abetted the fraudulent scheme in a calculated effort to induce GEICO into paying charges to RMS for medically unnecessary Fraudulent Services or illusory services that were not compensable under the No-Fault Laws, because he sought to continue profiting through the fraudulent scheme.

315. The conduct of Dr. Elhadidy caused GEICO to pay more than $1,000,000.00 pursuant to the fraudulent bills that the Defendants submitted or caused to be submitted through RMS.

316. The Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

317. Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## JURY DEMAND

318. Pursuant to Federal Rule of Civil Procedure 38(b), GEICO demands a trial by jury.

**WHEREFORE**, Plaintiffs, Government Employees Insurance Co., GEICO Indemnity Co., GEICO General Insurance Company and GEICO Casualty Co., demand that a Judgment be entered in their favor and against the Defendants, as follows:

A. On the First Cause of Action against the PC Defendants, a declaration pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, that the PC Defendants have no right to receive payment for any pending bills submitted to GEICO;

B. On the Second Cause of Action against Dr. El Soury, Dr. Elhadidy, Zemlyansky, Danilovich, Barukin, Zayonts, Kremerman, Zaretskiy, and John Doe Defendants 1 – 10, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $1,000,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

C. On the Third Cause of Action against Dr. El Soury, Dr. Elhadidy, Zemlyansky, Danilovich, Barukin, Zayonts, Kremerman, Zaretskiy, John Doe Defendants 1 – 10,

compensatory damages in favor of GEICO, in an amount to be determined at trial but in excess of $1,000,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

D.      On the Fourth Cause of Action against RMS, Dr. El Soury, Dr. Elhadidy, Zemlyansky, Danilovich, Barukin, Zayonts, Kremerman, Zaretskiy, John Doe Defendants 1 – 10, more than $1,000,000.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper;

E.      On the Fifth Cause of Action against RMS, Dr. El Soury, Dr. Elhadidy, Zemlyansky, Danilovich, Barukin, Zayonts, Kremerman, Zaretskiy, John Doe Defendants 1 – 10, more than $1,000,000.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper;

F.      On the Sixth Cause of Action against Shahen, Zemlyansky, Danilovich, Barukin, Zayonts, Kremerman, Zaretskiy, and John Doe Defendants 1 – 10, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $15,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

G.      On the Seventh Cause of Action against Shahen, Zemlyansky, Danilovich, Barukin, Zayonts, Kremerman, Zaretskiy, John Doe Defendants 1 – 10, compensatory damages in favor of GEICO, in an amount to be determined at trial but in excess of $15,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

H.      On the Eighth Cause of Action against Outreach, Shahen, Zemlyansky, Danilovich, Barukin, Zayonts, Kremerman, Zaretskiy, John Doe Defendants 1 – 10, more than

$15,000.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper; and

      I.      On the Ninth Cause of Action against Outreach, Shahen, Zemlyansky, Danilovich, Barukin, Zayonts, Kremerman, Zaretskiy, John Doe Defendants 1 – 10, more than $15,000.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper;

      J.      On the Ninth Cause of Action against Dr. Elhadidy, more than $1,000,000.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper.

Dated:      Uniondale, New York
             August 7, 2015

             RIVKIN RADLER LLP

             By:_____
                Barry I. Levy (BL 2190)
                Michael A. Sirignano (MS 5263)
                Ryan Goldberg (RG 7570)
             926 RXR Plaza
             Uniondale, New York 11556-0926
             Telephone:    (516) 357-3000
             Facsimile:    (516) 357-3333

             *Counsel for Plaintiffs, Government Employees Insurance Co., GEICO Indemnity Co., GEICO General Insurance Company and GEICO Casualty Co.*